(101 App. Div. 507.)

### L. D. GARRETT CO. v. APPLETON.

(Supreme Court, Appellate Division, First Department. February 17, 1905.)

**1. FRAUD—RESCISSION OF CONTRACTS—SCIENTER.**

In order to rescind a contract upon the ground of fraud, either the
representation of a fact known to be false, with intent to deceive, or
representation of actual knowledge of a fact, when no such knowledge
exists and the fact is not true, must be proved.

[Ed. Note.—For cases in point, see vol. 11, Cent. Dig. Contracts, §§ 1160–
1167.]

**2. SALES—RESCISSION—FALSE REPRESENTATIONS—RESPONSIBILITY OF VENDOR
—REPRESENTATIONS BY ANOTHER.**

Plaintiff and the general manager of a corporation of which defendant
was a stockholder and director had a conversation in which the purchase
of the corporation's stock was suggested. Subsequently the general man-
ager presented to plaintiff a statement as to the financial condition of the
company. Negotiations with a committee of the corporation's directors
were then begun by plaintiff, and after a time he made a proposal for
the purchase of the stock, which the executive committee transmitted to
defendant, who was not a member thereof, and other stockholders. De-
fendant accepted the proposal, and the sale was made. The statement
submitted by the general manager which plaintiff relied on in making the
purchase proved false, and the stock was worthless. *Held*, that defendant
was not responsible for the delivery of the statement to plaintiff, nor for
representations made therein, and plaintiff was not entitled to a rescis-
sion of the sale of the stock.

Appeal from Special Term, New York County.

Action by the L. D. Garrett Company against Daniel S. Appleton.
From a judgment for plaintiff, defendant appeals. Reversed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PAT-
TERSON, INGRAHAM, and LAUGHLIN, JJ.

Charles E. Lydecker, for appellant.
Edgar J. Nathan, for respondent.

INGRAHAM, J. This action is brought to rescind the sale made by
the defendant to the plaintiff of certain stock of the Traders' Fire Insur-
ance Company, on the ground of fraud, and to recover the considera-
tion had therefor. The complaint alleges that, as an inducement to
the plaintiff to negotiate for the purchase of the stock of the insurance
company, its directors prepared or caused to be prepared and presented
to the plaintiff a written statement purporting to show the assets and

liabilities of the insurance company, and that in all the negotiations between the plaintiff and the directors of the insurance company the directors and the executive committee thereof acted as agents for and on behalf of the defendant; that the said statements made by the directors as to the assets and liabilities of the insurance company were made to the plaintiff as a true statement, to the knowledge of the parties making them on behalf of the defendant; that the plaintiff relied upon said statements and representations so made to the plaintiff by the directors of the insurance company in making the offer to purchase the stock of the insurance company, and in making the payment for the said stock; that such statement and representations made to the plaintiff on behalf of the defendant were false and untrue; that the said fire insurance company was unable to pay the claims of its creditors, and that the stock was worthless; that, by reason of the falsity of such statements, the said contract for the purchase of said shares of stock by the plaintiff from the defendant is fraudulent and void, and the plaintiff is entitled to recover the consideration paid therefor; that after the discovery of the false statement the plaintiff elected to rescind the purchase of 32 shares of stock of the said insurance company so purchased by the plaintiff.

There is a second cause of action, which alleges that the purchase was made under a mutual mistake of fact on behalf of the plaintiff, and that such mistake on the part of the plaintiff was induced by the statements and representations made on behalf of the defendant. There is no allegation in the complaint that this statement was known by the directors of the insurance company to be false, or that it was made with an intent to deceive the plaintiff. For scienter, the plaintiff relies upon the allegation that the statement was made by the directors as a true statement of the condition of the insurance company to their own knowledge, and the scienter would then be in the assertion of knowledge of truth of the statement, when in fact the directors had no such knowledge and the statement was in fact false. To rescind a contract upon the ground of fraud, as to recover damages upon the ground of fraud, scienter must be alleged and proved; and while either the representation of a fact, knowing it to be false, made with intent to deceive, or representation of actual knowledge of a fact when no such knowledge exists and the fact is not true, is sufficient to support a cause of action, one of these conditions must be proved to exist to sustain any action based upon fraud.

The questions presented in this litigation have been before this court in actions brought by the plaintiff against other stockholders. The first case was that of the plaintiff against McComb, which was an appeal by the plaintiff from a judgment in favor of the defendant. 58 App. Div. 419, 68 N. Y. Supp. 996. The judgment was there affirmed upon the ground that there was no evidence to show any relation of principal and agent between the executive committee of the insurance company, conducting the negotiations with the plaintiff, and the defendant; that the defendant acted for himself in accepting the offer made by the plaintiff, and that the case was entirely barren of proof that the defendant, when he accepted such offer, had knowledge of the prior negotiations with the executive committee or other person; that the defend-

ant was not bound, therefore, by any representations made by the committee to the plaintiff, whether fraudulent or otherwise. The cases of Garrett Co. v. Morton, 65 App. Div. 366, 73 N. Y. Supp. 40, and Garrett Co. v. Astor, 67 App. Div. 595, 73 N. Y. Supp. 966, came before the court on demurrer to the complaints.

Upon the trial of this action the learned trial court found that the defendant was one of the directors of the insurance company; that the directors appointed an executive committee of eight of the directors; that the defendant was not a member of that committee; that in the middle of April, 1900, the general managers of the company presented to the board of directors a statement in writing purporting to show the condition of the company on the 1st of April, 1900, from which it appeared that there was a deficiency of assets of the company of $77,-957.20; that certain losses had been reported to the said company after the 1st day of April, 1900, the precise amount of which was not stated: that about the middle of April, 1900, one of the general managers and a director of said company handed to the president of the plaintiff a copy of this statement, and that, relying upon the correctness of said statement, the president of the plaintiff made to the said committee an offer for the stock, which he intended should be transmitted by the executive committee to the various stockholders; that on the 26th day of April, 1900, the directors of the insurance company referred to the executive committee the offer of the plaintiff, and requested the executive committee to negotiate on behalf of the stockholders the sale of their stock; that during said negotiations said statement was assumed by the executive committee and by the plaintiff to present a correct statement of the condition of the company on the 1st day of April, 1900, except in regard to the losses which had been reported after the 1st day of April, and that the plaintiff believed this statement was correct, and relied upon the same in making the offer and purchasing the stock of the defendant and of other stockholders of the corporation; that the executive committee, assuming to act on behalf of all the stockholders of the fire insurance company, received said offer from the plaintiff, and transmitted the same to each individual stockholder with the recommendation that said offer be accepted; that the defendant was at the time the owner of 32 shares of the stock of the insurance company, and as such owner accepted the proposition of the plaintiff to sell the stock at $25 per share, with knowledge that the same had been secured from the plaintiff by said executive committee, acting on behalf of himself and other stockholders of the insurance company; that the defendant thereupon sold and transferred to the plaintiff the 32 shares of stock, and the plaintiff paid the defendant therefor the sum of $800; that it was subsequently ascertained that this statement was false, that there were no assets applicable to the payment of the capital stock of the company, but that the said stock was entirely exhausted, and its assets were wholly insufficient to meet the liabilities of the company to its creditors, and said stock so transferred by the defendant and received by the plaintiff was entirely and absolutely worthless. The court also found, at the request of the defendant, that he took no active part in the management of the business of the insurance company, and had no knowledge thereof except from the statements of the managers. There

was no finding that either the board of directors, or the executive committee, or the defendant made any direct representation to the plaintiff, either as to the truth of this statement, or that the statement was true of their knowledge; or that the directors of the executive committee, or the defendant, had any knowledge or information as to the falsity of this statement, or that they did not, in conducting the negotiations, actually and in good faith believe in the truth of the statement which has been submitted to them by the general managers of the company.

An examination of the evidence discloses that the elements essential to constitute a cause of action for either a recovery for a defendant's fraud, or for the rescission of a sale of personal property on the ground of fraud, were not proved. The whole transaction which resulted in the offer by the plaintiff to purchase the stock of this company from its stockholders was managed by the plaintiff's president, and it was upon his testimony that the plaintiff sought to prove the cause of action. He testified that he had been engaged in dealing in insurance stock for about eight years; that about the middle of April, 1900, he had a conversation with Mr. Lockwood, one of the firm of Lockwood & Forman; that he had known the firm of Lockwood & Forman for a year or two, but had no business relations with them before the year 1900; that Lockwood and Forman were in the employ of the Traders' Fire Insurance Company as managers of that company; that the first suggestion that the witness had in reference to the purchase of the stock came from Mr. Lockwood in the middle of April; that at that interview he told Lockwood that he would not consider the purchase unless he (Lockwood) was authorized to act for the company and would give to the plaintiff a statement of its condition; that subsequently Lockwood brought this statement (Exhibit A) to the witness; that the witness had no reason to doubt that it was a true statement, and believed it to be true; that Lockwood's standing was good, and Lockwood stated that Mr. Halsey, the president of the company, knew he was coming to see the witness, and the purpose of his errand; that the directors of the company had decided to reinsure the company's business, or to sell its stock, and that he wanted to know if the witness would make a proposition to buy it. After the receipt of this statement (Exhibit A) on the 23d day of April, 1900, the witness wrote a letter making a proposition in relation to the stock of the company. This letter was addressed to Mr. Simpson, the vice president of the company. Subsequent to writing this letter, Mr. McMurran, a member of the firm of Lockwood & Forman, the general managers, but who had taken no active part in the business of that firm, invited the witness to meet the executive committee, and on the 26th of April he had a conference with that committee. He was there introduced to Gen. Tracy, one of the directors, as the man who would speak for the committee. Gen. Tracy stated that they were a committee appointed by the directors of the company, who represented all the stockholders, to arrange a sale of the stock of the company, or a reinsurance of the company's outstanding risks; that the committee had received the proposition from the plaintiff, but before they considered that proposition the committee wanted to know the plaintiff's intention in respect

to the company in case the plaintiff should acquire a majority of the stock; that they wanted it understood that the business would be reinsured and the creditors paid in full. The witness replied that he could not tell what action would be taken in respect to the company in case he should acquire the stock, and that the creditors would be paid in full. This statement, which had been submitted to the plaintiff by Lockwood, was then discussed, and the witness then made inquiries about the statement, when it was said that Mr. Halsey and Mr. Simpson could verify the statement. Gen. Tracy then said that they wanted the company to be reinsured, and asked if the witness could arrange for the reinsurance. This closed the interview, and the plaintiff then obtained a proposition for reinsurance, and on the next day again saw Gen. Tracy and his associates, with a Mr. Richards, who proposed to reinsure the outstanding risks. The statement (Exhibit A) was then handed to Mr. Richards, and upon inquiry of him the president stated that the reserve was then something over $70,000. Mr. Richards then asked if they had on hand the bonds represented by the statement, and was told that a part of those bonds had been sold to  pay losses, and that orders had been given to sell $75,000 worth of the bonds to pay upon the reinsurance; that a contract was then made to insure the outstanding risks of the company, and Mr. Richards left, Gen. Tracy requesting the witness to remain. Gen. Tracy then stated that the plaintiff's proposition was not satisfactory, and wanted to know if the plaintiff would not make a cash offer of $40 per share for the stock. This the witness refused to make. The witness then desired to examine the books as to losses sustained prior to April 1st, when the statement was made up. On May 3d there was another meeting at the office of the company, when a question was raised about an item of $3,500 which did not appear in the statement. Gen. Tracy then asked the witness if he would pay $25 per share in cash for the stock, which the witness declined, offering $23.25 per share in cash. This offer was refused. On May 5th there was a meeting, at which the witness made an offer of $25 per share. On May 9th the witness again met this committee, and submitted in writing the proposition which was addressed to the stockholders of the fire insurance company, and was as follows:

"Confirming our arrangement made with your Executive Committee, we beg to say that if sixty-five (65) per cent. or more of the shares of The Traders' Fire Insurance Company's stock are deposited with the American Exchange National Bank on or before the first day of June, 1900, properly endorsed in blank, we will purchase the same, paying therefor at the election of the depositing stockholders according to one of the following propositions."

This first proposition was to pay $40 a share, less certain deductions to be made, and the second was to pay to all depositing stockholders preferring to accept immediate cash payment $25 a share as soon as 65 per cent. or more in the aggregate of the stock should have been deposited with the American Exchange Bank under one or both of these propositions. At this meeting a circular to the stockholders was prepared by the executive committee, which stated that the executive committee had negotiated with the L. D. Garrett Company, and had received from that company this proposition: that the executive committee recommended all stockholders to accept one of these propositions,

as being in their judgment the best arrangement that could be made under the circumstances. This circular was sent to the defendant and the other stockholders of the company, and the defendant deposited his stock with the bank, and accepted 25 per cent. in cash for the transfer of the stock to the plaintiff.

It is not disputed but that this statement which had been received by the plaintiff grossly overestimated the assets of the company and underestimated its liabilities, and that at the time it was received by the plaintiff the assets of the company were not sufficient to pay its debts, and the stock was therefore worthless. It is also apparent that this statement was before the parties present at the meetings in April and May at which the proposition of the plaintiff to purchase the stock of the company was discussed, and was assumed by both parties to be a correct statement of the assets and liabilities of the company at the time it was dated, with the exception of one sum of $3,500, which was an indebtedness of the company, and which did not appear upon the statement, and in relation to certain bonds that had been sold. It may be that if an agreement had been arrived at based upon this statement, and assuming it to be true, such an agreement could be rescinded as based upon a mutual mistake of fact. No such agreement, however, was made at either of these meetings between the plaintiff and the directors or executive committee of the company. In relation to this negotiation, it must be borne in mind that, although the gentlemen who negotiated with the plaintiff were directors and officers of the company, no contract between the plaintiff and the company was contemplated at any time. The proposal to purchase this stock was first brought to the attention of the president of the plaintiff by one of the general managers of the company. The plaintiff's president testified that Mr. Lockwood was one of the general managers of the company. Lockwood had then no authority to make a proposition of that kind, and the proposition was not made on behalf of the company, for the company had no stock to sell, and it is clear from the evidence that the plaintiff's president understood this. The plaintiff told Lockwood that he wanted a statement of the condition of the company, and a few days after Lockwood brought to the plaintiff this statement, Exhibit A. This statement did not purport to be issued by the company or by its authority. It was a memorandum of the assets and liabilities of the company, given by Lockwood to the plaintiff's president without authority from any one, and there is nothing to show that at this time either the board of directors or the executive committee had any knowledge that the purchase of the stock of the company was contemplated. The directors had before this realized that the company was in difficulties, for on the 18th of April, 1900, a number of the directors being present, but there being no quorum, a resolution of those present was adopted, which stated that it was the sense of those present that a recommendation be made to the executive committee to investigate the affairs of the company and report its condition and a plan of action to the directors at a special meeting to be called for that purpose at the earliest possible moment, and that meanwhile the executive committee make inquiries about reinsuring the entire business of the company. This was about the time that statement (Exhibit A) was given by

Lockwood to the plaintiff's president. On the 23d of April the plaintiff's president wrote a letter addressed, at Lockwood's suggestion, to the vice president of the company, which, so far as appears, was the first intimation that the officers or directors of the company had that the plaintiff contemplated the purchase of the stock of the company, and it was on the 26th of April that the plaintiff's president had his first meeting with the directors of the insurance company. The directors who met the plaintiff's president were all stockholders, and endeavored to secure from the plaintiff the largest offer for the stock possible, but the proposition of the plaintiff was an offer to the stockholders to purchase the stock. It was undoubtedly based upon a statement which the plaintiff's president had received from an employé of the company—a statement which the plaintiff had knowledge was false in one particular—and, when the proposition was made, the plaintiff understood that the directors had insisted that the outstanding risks should be reinsured, and that the company was to retire from business.

The plaintiff was thus purchasing the stock of a corporation that had substantially given up its business. What the plaintiff was purchasing was not the stock of a going company which was to continue in business, but the stock of a company which in reality had gone out of business, and whose affairs were to be liquidated. I assume that if it had subsequently appeared that this statement had overestimated the assets of the company or underestimated its liabilities, so that the plaintiff would receive a larger sum upon its stock than that which would appear upon the face of the statement, the stockholders could not have objected and rescinded the arrangement. So far as the stockholders were concerned, there was no proposition submitted by them or on their behalf to the plaintiff; but the plaintiff submitted a proposition to the stockholders, after negotiation with certain of the stockholders who were also directors and members of the executive committee of the corporation, as to the price that the plaintiff was willing to pay to the stockholders for their stock. The defendant, although a director of the company, had taken no active part in its management. He had never examined the books. He had no knowledge that any statement had been made to the plaintiff as to the condition of the company, and his sole connection with the transaction appears to have been that he was present at a meeting of the directors when the resolution as to the reinsurance of the outstanding risks of the company was agreed to, and subsequently, meeting the plaintiff's president, expressed a desire to obtain more than $25 per share for his stock. With this knowledge, and this being the situation, he received from the executive committee a communication which stated that, confirming an arrangement made with the executive committee, the plaintiff offered to purchase the defendant's stock, which offer the defendant accepted. If the executive committee had made an agreement as representing this defendant, we may assume that, by accepting the benefit of such an agreement, the defendant would necessarily ratify the representations made by his agents, or those assuming to act as his agents, during the negotiations. But the executive committee did not assume to act for the defendant; it made no arrangement for him, but received and sub-

mitted to him a proposition made by the plaintiff to purchase his stock. There was in this no notice to the defendant that the executive committee had assumed to act as his representative, or had made any representations to induce the plaintiff to make this offer, and nothing to place the defendant in the position of ratifying any statements or representations that the committee had made if he accepted what on its face was an independent offer to him by the plaintiff to purchase this stock; but, as before stated, there was no evidence to show that the committee had acted fraudulently or in bad faith, or that they had made any representations to the plaintiff or its president upon which could be based a charge of fraud. The utmost that can be claimed is that both the plaintiff's president and the executive committee had assumed a condition to exist which did not exist, without any evidence that the committee had or claimed to have any knowledge of the truth of the statement. The plaintiff's president testified that an examination of over six weeks was required to ascertain the amount of reinsurance reserve in April, 1900, and it is apparent that to ascertain the amount of the reinsurance reserve required an expert familiar with the insurance business. The plaintiff's president purchased the stock as a speculation. He did not rely upon Exhibit A as a guaranty that plaintiff would get $120,000 on the stock, nor did he expect that the assets would net $120,000, but knew there was a probability that there would be a shrinkage in some of the figures in the outstanding accounts. With this knowledge, he submitted to the stockholders an offer to purchase their stock. That offer was accepted, and, having made a bad bargain, he has lost his money; but as between the plaintiff and the defendant, a stockholder who took no part in the negotiations, the defendant was not responsible for the delivery of the statement by Lockwood to the plaintiff, nor did he make any representation that that statement was true. The evidence shows that the affairs of the company were managed by the general managers, who kept the books from which the condition of the company could be ascertained, and that the company itself kept no books, and had no method of ascertaining its condition except from the reports of its managers. Upon this state of facts, it seems to me that there was nothing to justify the plaintiff in rescinding the sale of the stock by the defendant and recovering back the amount that was paid.

It follows that the judgment appealed from must be reversed and a new trial ordered, with costs to the appellant to abide the event. All concur.