SPENCER R. HILL and Others, General Partners, and HENRY C. WILEY and Another, Special Partners, Copartners Doing Business under the Firm Name and Style of RICHARDSON, HILL & Co., Plaintiffs, *v.* INTERNATIONAL PRODUCTS COMPANY and Others, and ARTHUR A. MARSTERS and Others, as Executors of and Trustees under the Last Will and Testament of THEODORE N. VAIL, Deceased, Defendants.

Supreme Court, New York County, November 10, 1925.

Corporations — stock — action by investment brokers for rescission of contract of purchase of corporate stock on ground of misrepresentations inducing purchase — not necessary to prove fraud — declaration of dividend prior to sale constitutes representation that corporation had surplus — evidence shows insufficient surplus to pay dividend at time of declaration — representation was materially false and was inducing cause to sale — increase in value of assets not to be considered in determining surplus — declaration of dividend without surplus after sale not material — other representations not material, or not proven, or not inducing cause — directors of corporation are liable for individual acts only — directors liable at law only for actual fraud in declaring illegal dividend — no fraudulent intent shown — it seems that individual defendants were not properly joined — estoppel — laches — delay by plaintiffs of several months in demanding rescission or commencing action estops them from maintaining action for rescission.

This is an action by investment brokers to rescind a contract for the purchase of preferred shares of the defendant corporation. The action is based on the alleged misrepresentations of material facts inducing the purchase. A short time prior to the sale, the defendant corporation declared a dividend which was paid in stock. At the time of the declaration of the dividend, the evidence shows that the corporation did not have a surplus sufficient to meet the dividend, although some reports which it had from its South American offices indicated that the surplus on paper was more than enough to pay that dividend. It is not necessary, in an action of this kind, to establish fraud, and since the declaration of the dividend constituted a representation that the corporation had a surplus sufficient to pay it, and since it appears from the evidence that that representation was false and was a material inducing cause to the purchase of the stock by the plaintiffs, plaintiffs are entitled to rescission of the contract if they are not estopped from claiming the right to rescind.

In determining whether or not a corporation has a sufficient surplus to declare a legal dividend, the increase in the value of its assets should not be taken into consideration.

The declaration of a dividend made after the contract was entered into, although it was illegally made, there being no surplus from which the dividend could be paid, is immaterial and does not affect the rights of the parties in this action.

Certain other alleged representations in reference to the financial condition of the corporation, the use to which the money realized from the sale of the stock was to be put, and whether or not certain personal property of the corporation was free and unincumbered, that all of the corporation's preferred stock excepting a certain part thereof had been sold for cash, and that all of its bonds had been sold for cash at par, were either not proven or were not material or did not constitute an inducing cause to the purchase of the stock. In reference to certain alleged misrepresentations, the evidence shows that the plaintiffs had knowledge of the actual truth before the contract was made.

An alleged misrepresentation as to the quantity of material the defendant corporation had in its South American plant, and the alleged misrepresentation as to the climatic conditions in South America in reference to the raising and breeding of cattle, and as to the quantity of land which the corporation held, were not proven.

An alleged misrepresentation as to the efficiency of the management of the corporation was merely an expression of opinion and was not an inducing cause to the contract of purchase.

The individual defendants, who were directors of the defendant corporation, are not individually liable, nor can some of the individual defendants be held responsible for the action of other directors, for a director is liable only for his own acts.

Furthermore, directors of a corporation are liable at law for damage arising out of the illegal declaration of dividend only in case actual fraud is proven where the proceeding is not under section 58 of the Stock Corporation Law. In this case the evidence does not show any intent on the part of the directors to commit a fraud, but it does indicate that at the time the directors voted to declare the illegal dividend they believed that the corporation had sufficient surplus to warrant their action.

*It seems*, that the individual defendants were not properly joined in this action for a rescission of the contract of purchase. But while that question is raised, it was not passed upon by the court.

The plaintiffs cannot recover in this action, notwithstanding the misrepresentation of a material fact inducing the contract of purchase, for the evidence shows that the action herein was begun in February, 1921, and that almost one year prior thereto the plaintiffs or some of them had knowledge of the facts upon which they rely, and that during a part of that period the plaintiffs were actively associated with the defendant corporation.

ACTION by investment brokers for the rescission of a contract for the purchase of stock of the defendant corporation.

*Samuel Seabury* and *John Z. Lowe* [*Samuel Seabury, John Z. Lowe* and *George Trosk* of counsel], for the plaintiffs.

*White & Case* and *Frank C. Laughlin* [*David Paine* of counsel], for the defendants.

*White & Case* [*Charles J. Fay, David Paine* and *Aron Steuer* of counsel], for the defendant corporation.

*Laughlin, Gerard, Bowers & Halpin* [*Frank C. Laughlin* and *Joseph W. Kirkpatrick* of counsel], for the individual defendants.

MAHONEY, J. The plaintiffs, investment brokers in business in Boston, Mass., seek to recover of each and all the defendants the sum of $1,440,000, with interest. The action is in equity for the rescission of a contract of stock purchase under and by virtue of which the plaintiffs paid to the defendant the International Products Corporation the said sum for certain shares of the preferred and shares of the common stock of defendant corporation. The plaintiffs on October 2, 1919, entered into the contract which is the subject of this action with the defendant corporation for the purchase of 10,000 shares of preferred stock. The agreement is in evidence and a copy of it is attached to defendants' answer. The agreement reads as follows:

" *October* 2, 1919.

" THE INTERNATIONAL PRODUCTS CO.,
    " 120 Broadway, New York.

" Messrs. RICHARDSON, HILL & Co.,
    " Boston, Mass.

" DEAR SIRS.— We confirm the arrangement closed with you yesterday, as follows: We have sold to you and you have purchased from us ten thousand (10,000) shares of the seven per cent (7%) cumulative preferred stock of The International Products Company at the price of seventy-two dollars and fifty cents ($72.50) per share, with an option for sixty (60) days from this date whereby you may purchase all or any part of an additional ten thousand (10,000) shares of said preferred stock at the same price; payment and deliveries as to all the preferred stock purchased shall be made upon five (5) days' prior notice in writing received from you, in lots of not less than two thousand (2,000) shares, upon the understanding that one-fifth (1-5) of the ten thousand (10,000) shares already purchased and also one-fifth (1-5) of so many of the additional ten thousand (10,000) shares as you may have elected to purchase under the option shall be taken and paid for not later than during the months of January, February, March and April, 1920, respectively; such deliveries shall be in scrip representing preferred stock in appropriate amounts and bearing interest at the dividend rate of such preferred stock, until the next succeeding preferred stock dividend payment date, at which time such scrip shall be exchangeable for certificates of preferred stock; we will provide a fund of twelve thousand five hundred ($12,500) dollars

for publicity in connection with the ten thousand (10,000) shares already sold to you and proportionately in addition thereto, in connection with such portion if any of the additional ten thousand (10,000) shares as may be purchased by you under the option. Please confirm your agreement to the above by your signature below, returning one copy so signed.

" Very truly yours,
" (Signed)   PERCIVAL FARQUHAR,
" *Vice-president.*"

" THE INTERNATIONAL PRODUCTS COMPANY,
            " 120 Broadway, New York City:
" DEAR SIRS.— We confirm the arrangement closed with you yesterday as to the purchase of preferred stock of your company upon the terms above set forth.

" Very truly yours,
            " (Signed)   RICHARDSON, HILL & CO."

It is provided in the agreement that the plaintiffs were to have an option for sixty days to purchase at the same price per share 10,000 more shares of the preferred stock. This option was exercised by plaintiffs on November 17, 1919. The evidence shows and reference will hereafter be made to the fact that on March 13, 1920, arrangements were made for the substitution of common stock for the amount of preferred stock, viz., 8,000 shares that still on that date remained to be taken up by plaintiffs under the contract. Payments were made aggregating $1,440,000, as follows: October 20, 1919, $145,000; December 31, 1919, $145,000; June 30, 1920, $290,000; February 28, 1920, $290,000; April 5, 1920, $285,000; April 30, 1920, $285,000; total, $1,440,000.

It was stipulated on the record that such payments were made and it was further stipulated that in consideration of such payments plaintiffs received 12,000 shares of preferred stock and 22,800 shares of common stock of defendant company. The plaintiffs claim that the contract of purchase was induced by representations made by defendants and that such representations were false and fraudulent.

The material allegations of the complaint in substance are as follows:

The plaintiffs are and at all the times mentioned in the complaint were engaged in business as investment bankers. The defendant International Products Company is a corporation organized under the laws of the State of Maryland, as would appear from a certificate of incorporation filed in the office of the Secretary of that State in or about July, 1916. The total authorized capital stock of the International Products Company, as provided in its certificate of incorporation, is $5,000,000 in preferred stock and 100,000 shares

of common stock without nominal or par value.  The capitalization of defendant corporation was from time to time increased after its incorporation until on or about September 1, 1919, its total authorized capital stock was $6,000,000, divided into 60,000 shares of preferred stock of a par value of $100 each, and 135,000 shares of common stock having no nominal or par value.  The individual defendants were the promoters of this defendant corporation and of the plans of said corporation and at the times mentioned in the complaint were interested in and instrumental in soliciting the investment of capital in the defendant corporation by procuring subscriptions to or sales of the capital stock.  At the times mentioned in the complaint the individual defendants were directors of defendant corporation except that defendant Armour resigned as a director about the month of November, 1919.  Defendant Van Pelt was at all times mentioned the agent in fact of defendant Armour and represented Armour in the different matters in the complaint alleged.  Defendant Theodore N. Vail was a director of defendant corporation until his death on April 16, 1920.  The defendants Arthur A. Marsters and Katherine Marsters and Guaranty Trust Company of New York are the duly appointed executors and trustees of the last will of the said Vail.  Defendant William M. Baldwin was chairman of the board of directors of defendant corporation and defendant Sulzberger was a vice-president.  Defendant Stevens was treasurer and defendant George H. Olney, secretary.  Defendant Percival Farquhar was a vice-president, and said defendant Farquhar " was the agent of all the other defendants herein, employed and authorized by them to solicit and receive subscriptions to the capital stock of the defendant corporation." In or about August, 1919, defendants commenced negotiating with the plaintiffs to take up the work of providing the defendant corporation with funds for the prosecution and advancement of their enterprise, viz., the defendant corporation, and for that purpose to purchase some of the preferred stock of the defendant corporation and distribute the same by sale among the clients of the plaintiffs and to the public, in which distribution the defendant corporation would assist by furnishing prompt and accurate statements of earnings and operations and by contributing a large amount of money for advertising such distribution.  The defendants, in order to induce the plaintiffs to enter into the contract mentioned in the complaint, falsely represented to the plaintiffs herein, knowing that the plaintiffs would rely thereon, that the defendant corporation had up to that time been operating at a profit and that it had large surplus earnings applicable to the payment of dividends out of profits. and that the defendant cor-

poration in consequence of these large profits had fixed upon and adopted a dividend policy of paying dividends at regular periods, and the plaintiffs, relying upon such representations, in addition to other representations hereinafter referred to and upon the faith thereof, entered into a contract of purchase hereinafter further referred to. These representations were false and known by defendants to be false. The by-laws of the defendant corporation provided that the vice-president or any one or more of the vice-presidents designated by the board of directors should have all the powers and discharge all the duties of the president, and said by-laws further provided that the president should be the chief executive officer of the corporation. At the times mentioned in the complaint there was no president of said corporation. On or about August 19, 1919, defendants Baldwin, Berwin, Chipp, Farquhar, Keith, Olney, Stevens and Van Pelt, as directors of defendant corporation, attended a meeting of the board of directors of defendant, and said defendants at said meeting approved, voted for and passed a resolution providing for the payment out of the profits of all dividends on preferred stock of the defendant corporation accrued up to June 30, 1919, and represented and stated to the public and to the plaintiffs that such profits had theretofore been earned and existed. Said representation was false and was known by defendants to be false and was made to induce the plaintiffs to enter into the contract of purchase of defendant upon the faith thereof. The plaintiffs did rely upon such representations and did enter into the contract of purchase upon the faith thereof. Defendant Van Pelt in voting for such resolution and in making said representation acted not only in his own behalf, but as the agent of defendant Armour. All of the other defendants prior to the time the plaintiff entered into the contract of purchase, with knowledge of the falsity of the representations, approved and ratified the same and adopted the same as their own and joined therein.

The unpaid dividends accrued up to June 30, 1919, on the preferred stock of the defendant corporation and unpaid up to and on August 19, 1919, amounted to large sums of money. Each of the representations alleged in paragraphs 19, 21 and 27 to 81 of the complaint was made by the defendants. Defendant represented that the American International Corporation had bought of the defendant corporation bonds of the defendant corporation of the amount of $1,300,000 and had paid the sum of $1,300,000 therefor, and defendant stated that the said entire $1,300,000 had been used for proper corporate purposes of defendant corporation. Defendants stated and represented that defendant corporation had

subscribed for $1,250,000 of the $1,500,000 of common stock of Central Products Company in cash at par, and that the said stock had been issued to the defendant corporation at its fair and true value. Defendants stated and represented, as appears in paragraph 30 of the complaint, that defendant corporation had acquired upwards of 1,000,000 acres of land in the chaco of Paraguay, partly in quebracho forests, which experts had found to contain about 2,000,000 tons of good merchantable quebracho wood, and the balance in good pastures for the breeding and fattening of cattle. Some of the other representations which it is alleged the defendants made are as follows: That defendant corporation owned 60,000 acres of pastures on the east side of the Paraguay river; that it owned about 2,375 square miles of rich, well-watered cattle grazing lands and quebracho forests in the Paraguay river basin, where the climatic conditions were nearly perfect for the breeding and fattening of beef cattle; that it had a fully equipped modern quebracho extract plant on its property at Puerto Pinasco; that the said quebracho extract plant was then in operation; that said plant had a present capacity of 15,000 tons per year; that the capacity of said plant could be economically doubled.

Paragraphs 37 to 81 of the complaint are likewise taken up with certain specific representations which it is alleged the defendants made to the plaintiff.

The complaint then further alleges that the plaintiffs relied upon each and every one of these representations, which were all false, and were induced to enter into the said contract with the defendant corporation in reliance thereon. The complaint then likewise alleges that with the intent to deceive plaintiffs certain other material facts were concealed. In paragraph 90 of the complaint it is stated that upon the faith of each and every of the aforesaid representations and in reliance thereon and in ignorance of the aforesaid concealment the plaintiffs entered into the agreement with the defendants which is the subject of this action. The complaint then continues: At all times between October 1, 1919, and November 17, 1919, the defendants reaffirmed to plaintiffs each and every of the representations heretofore alleged, and between said dates defendants continued to and did conceal from the plaintiffs each of the facts hereinbefore alleged to have been concealed. The defendants reaffirmed said representations and persisted in said concealments in order to induce plaintiffs to exercise their aforesaid option to purchase 10,000 additional shares of the preferred stock of defendant corporation. The plaintiffs relied upon each of the aforesaid representations and in ignorance of the aforesaid concealments on or about November 17, 1919,

exercised their option to purchase the aforesaid second lot of 10,000 shares of preferred stock of defendant corporation. For the purpose and with the intent of inducing plaintiffs to continue taking up said stock and supplying money to the defendant corporation at the times named in the contract the defendants on or about December 5, 1919, stated and represented to plaintiffs that dividends had been earned on preferred stock of the defendant corporation, and would be declared on January 1, 1920. The defendants in December, 1919, stated and represented to the plaintiffs that the profits of the defendant corporation for 1919, based on actual operations up to that time, were $1,100,000, and defendants in March, 1920, represented to plaintiffs that for the first ten months of 1919 the net profits of defendant corporation were sufficient to pay all outstanding dividends on the preferred stock of the defendant corporation up to December 31, 1919. For the purpose and intent of inducing plaintiffs to continue the taking of said stock and supplying money to defendant corporation at the times named in the contract, defendants in December, 1919, represented to plaintiffs that defendant corporation had earned since the declaration of the last dividend, and then had, net profits applicable to the payment of dividends in a sum at least sufficient to pay three and one-half per cent dividends on all the outstanding preferred stock. Defendants, however, concealed from the plaintiffs the fact that defendant corporation had paid for certain boats in part by the issue of bonds of the International Products Steamship Company of the face amount of $636,000, the payment of which bonds the defendant corporation had guaranteed, thereby increasing the indebtedness of the defendant corporation by a large amount. Between November 17, 1919, and March 13, 1920, the defendants reaffirmed each of said representations hereinbefore alleged and did conceal during the said time from the plaintiffs each and every of the facts alleged to have been concealed. Plaintiffs relied upon each and every of said representations which were false and known to defendant to be false. On or about March 13, 1920, relying upon the aforesaid representations, the plaintiffs agreed with the defendant corporation to and did modify the agreement of October 2, 1919, by agreeing to take common stock of the defendant corporation in place and stead of any preferred stock not theretofore taken, in accordance with the terms of the agreement, and between October, 1919, and May 20, 1920, the plaintiffs took from the defendant corporation 12,000 shares of the preferred stock and 22,800 shares of the common stock of defendant corporation and paid therefor to the defendant corporation between the months of October, 1919, and May, 1920, the sum of $1,440,000.

The plaintiffs then further allege that promptly upon discovering the falsity of the aforesaid representations and the concealments they demanded from defendant corporation that it cancel the aforesaid agreement of October 2, 1919, and the modification thereof, and that the same be surrendered, and it is further alleged that plaintiffs demanded the repayment to them by the defendants of the said sum of $1,440,000 and said demand was refused. The plaintiffs were ready and willing and did thereby tender and offer to surrender said certificates of stock and return all dividends and benefits received upon the said stock and all moneys paid by defendant corporation to plaintiffs. Plaintiffs have no adequate remedy at law and would necessarily be put to the burden of the prosecution of many actions with great uncertainty of collection unless the relief prayed for be granted.

The prayer for relief demands (1) that defendant corporation take back the certificates of stock and that there be returned to the plaintiffs by the defendants and that plaintiffs recover of each and all of the defendants the sum of $1,440,000, with interest; (2) that the agreement of October 2, 1919, and the modification thereof be adjudged to be null and void and canceled and rescinded, and that defendant corporation be enjoined from asserting the validity thereof; (3) that defendant corporation be required to mark its books and records to show that plaintiffs are not the holders of any part of the aforesaid 12,000 shares of the preferred and 22,800 shares of the common stock of defendant corporation; (4) that an accounting be had of the damage sustained by plaintiffs; (5) that the plaintiffs have such other and further relief as to the court may seem just and proper. The foregoing are in substance the material allegations of the complaint. The amended answer of the defendant corporation, which is substantially the same as the answer of the individual defendants, sets up denials of the material allegations of the complaint (paragraphs 1 to 30, inclusive). Then follows a first defense which alleges in substance that the plaintiffs were given full information as to the material facts, but with full knowledge thereof they ratified their purchase of stock and took no action whatsoever, thereby estopping themselves from this action (paragraphs 32 to 39, inclusive). The second defense, in addition to the facts in the first defense, sets forth the switch from preferred to common stock on March 13, 1920, and alleges waiver thereby (paragraphs 40, 41). The third defense repeats the allegations of the first defense and alleges that subsequent to March 13, 1920, and before June 11, 1920, defendant company furnished plaintiffs with a full and accurate statement

3

of its financial condition and all the facts relative to the company, and that thereafter plaintiffs joined with the defendant in the formulation of plans for the rehabilitation of the company and that one of their number became a member of the board of directors of the defendant on June 28, 1920, and that about that time the plaintiff George Putnam became a voting trustee. It is then alleged that Putnam participated with all the defendants in the activities to save the company and thereafter further capital was obtained by the issue of preferred and common stock and that George Putnam continued as director and voting trustee until January 21, 1921, and that on November 8, 1920, and November 23, 1920, the plaintiffs deposited a total of 600 shares of their common stock in the voting trust agreement and that about January 18, 1920, the individual defendants underwrote a $5,000,000 issue of notes and agreed to make advances to the defendant corporation. It is alleged in this third defense that of all these facts plaintiffs had notice and did not dissent from the note issue or other proposed methods of financing. There follows then another allegation of estoppel based on the facts already set forth and the change of position on the part of defendants.

Prior to the trial the complaint was dismissed against Arthur A. Marsters, Katherine Marsters and the Guaranty Trust Company of New York, as executors of and trustees under the last will and testament of Theodore N. Vail, deceased, by reason of the fact that Theodore N. Vail died a non-resident of the State of New York and his executors were not subject to suit in this State. (*Hill* v. *International Products Co.*, 198 App. Div. 591.) At the trial, by consent, the complaint was dismissed as against defendants Sulzberger and Streeter. Upon the trial the following four matters were left with decision reserved:

(1) A motion by defendant corporation to strike out and exclude all testimony with reference to the dividend of December 31, 1919, so far as its being a representation.

(2) A motion by the individual defendants to strike out as to them all testimony of representations made by Mr. Farquhar.

(3) A motion by the individual defendants to dismiss the complaint as to them on the ground that an improper joinder had been attempted.

(4) A motion by all the defendants to dismiss the complaint on the ground that no cause of action had been proved.

These motions are herewith denied except as hereinafter specifically noted.

This action, therefore, is an action in equity for the rescission of a contract to purchase stock. It is true that the complaint

alleges the essentials of an action in fraud and deceit, including scienter, but in an action in equity for a rescission, so far as defendant corporation is concerned, it is unnecessary to prove fraud and hence unnecessary to establish scienter. Mistake of fact or a misrepresentation, even though innocently made, upon the faith of which plaintiff relied, is sufficient. Intent of the one complained against is immaterial. (*Bloomquist* v. *Farson*, 222 N. Y. 375.) Plaintiff, to recover against the corporation, however, has the burden of proving that defendants made false representations of a material fact; that plaintiffs were deceived by such representations and were induced by the same to enter into the contract and that they acted promptly on discovery of the alleged misrepresentations or acted promptly when put on notice and guard as to the truth of such representations. " Unlike an action at law for damages, intentional misstatements need not be proved. * * * The fact that the plaintiffs have alleged fraud and deceit is not fatal to the action provided the proof establishes misrepresentations and that these are material, influencing the bargain." (*Bloomquist* v. *Farson, supra,* 380.) " The real question is, whether the fraudulent affirmation was upon a material point, and whether the injured party relied upon it." (*Hammond* v. *Pennock*, 61 N. Y. 145, 152. See to like effect *Canadian Agency, Ltd.,* v. *Assets Realization Co., No. 1,* 165 App. Div. 96.) The representations against which plaintiffs complain and which it is alleged were the inducing cause of their entering into the contract of October 2, 1919, were narrated at the trial mainly in the testimony of witnesses Gurnett, Holder, McKean and Putnam. Holder was the firm's representative. The others were members of plaintiff firm. In order that the evidence given by these persons might be the more readily understood it is to be noted that the defendant International Products Company seems to have been organized on or about July 18, 1916. Simultaneously with this organization, the Central Products Company was formed. The latter company was owned by the former. The business of the two companies was conducted entirely in South America. The International Products Company was an American company, having been organized in Delaware, but it had its principal office in New York city. The business of these two companies consisted in the main in (1) dealing in cattle and cattle raising; (2) canning of meats; (3) quebracho extract. The International Products Company had many acres of pasture lands along the Paraguay river. It owned cattle which had been taken over from the New York and Paraguay Company. The quebracho business seems to have been located at Puerto Pinasco. At San Antonio it had a meat packing plant.

At the times complained of it likewise owned certain boats, tugs, barges, etc., which it used to bring its product down the Paraguay river to the sea coast. At the organization of the International Products Company in July, 1916, there were three directors, two of whom were employees and dummies of defendant Sulzberger, and one was a secretary and dummy of Farquhar. Farquhar was the originator of the idea of the International Products Company and he suggested the purchase of the properties of the New York and Paraguay Company, organized in 1910 by defendants William M. Baldwin and Joseph E. Stevens and their associates. Baldwin and Stevens seem to have been the controlling forces in the New York and Paraguay Company. At the times complained of in the complaint Farquhar was the vice-president and apparently the active man in the affairs of defendant corporation. There was no president at the time. Prior to May, 1917, Farquhar had procured an option to purchase certain property of the said New York and Paraguay Company. The option was exercised and an agreement of purchase executed. This agreement was signed by defendant William M. Baldwin, as president, on behalf of the New York and Paraguay Company, and on behalf of the defendant the International Products Company by its president, L. M. Crowe. This agreement provided for the sale by the Paraguay Company to the Products Company of all the assets and property of the Paraguay Company excepting its New York office furniture and equipment and cash on hand, in return for which the Products Company agreed to give $500,000 in cash, $700,000 par value of its seven per cent cumulative preferred stock, 7,700 shares of its own par value common stock, and in addition to pay the Paraguay Company or its directors, as trustees in dissolution, the expenses of the Paraguay Company since October 13, 1916, in connection with a certain litigation; to pay the defendants William M. Baldwin and Joseph E. Stevens $54,151 advanced by them to pay off a certain mortgage formerly on the property and to pay to the Paraguay Company all interest on that mortgage since October 13, 1916, and to assume the payment to the government of Paraguay of all sums necessary to be paid to it in order to acquire title to one of the parcels of land. The contract further provided for the taking of an account of the business of the Paraguay Company from October 13, 1916, to the date of the delivery of the deeds, and if this account should show a profit to the Paraguay Company during this period, the amount thereof was to be paid to the Products Company by the Paraguay Company, whereas if it should show a loss the Products Company agreed to pay the amount thereof to the Paraguay Company. This agreement was examined

by all the directors of the International Products Company who were the employees of Sulzberger and Farquhar and thereupon resolutions were passed fully approving, ratifying and confirming the acts of the officers of the company in making the agreement, and the officers were directed to carry it out. At the same meeting at which this resolution was passed a letter from Farquhar was presented in which he suggested the issue to him of 50,072 shares of common stock of the defendant corporation in payment of services claimed to have been rendered by him in connection with procuring the New York and Paraguay Company for the defendant corporation and in procuring subscriptions to its stocks and bonds. This proposal was accepted in all respects. The amount of stock to be issued to Farquhar was subsequently increased to about 80,000 shares and this amount was given to him.

After the purchase of the New York and Paraguay Company it appears that there had been various contributions of money by individual directors through stock issues, and in the summer of 1919 plans were made to enlist new money. It was at about this time that the plaintiffs became interested in the International Products Company, and during the summer of 1919 it appears that there were conferences between different members or representatives of the plaintiff firm and with certain members of the defendant corporation, and that the person mainly actively representing the defendant corporation at such conferences was the defendant Farquhar. At this point the claims of the plaintiff can the better be understood by referring somewhat in detail to the more material oral representations which plaintiffs claim were made to them at different times.

H. A. Holder was employed by the plaintiffs, having charge of plaintiffs' investigations of new properties brought to plaintiffs to finance. He met Farquhar in defendants' New York office in August, 1919, about the middle of that month. Mr. Hamilton, a customer's man for plaintiffs, had asked Holder to come over to New York to meet defendant corporation's representative, because Hamilton had become interested in the International Products Company. Holder had a talk with Farquhar and other defendants, as a result of which Farquhar came to Boston to directly interview plaintiffs' firm. On or about August twenty-third Farquhar met Gurnett, who actively represented plaintiffs in connection with negotiations leading up to the contract of October second. Plaintiffs' version of the alleged representations is based upon the different conferences or meetings which were had with Farquhar and other individual defendants. A list of the different more important conferences, the dates thereof and those

present of the individual defendants, are as follows: August 14 or 15, 1919, defendants present, Farquhar, William M. Baldwin, Stevens, and part of the time defendant Van Pelt; August 25, 1919, defendants present, Farquhar; September 3 or 4, 1919, defendants present, Farquhar; September 5, 1919, defendants present, Farquhar and William M. Baldwin; October 1, 1919, defendants present, Farquhar.

The plaintiffs' story of said meetings or conferences, as told in the evidence at the trial given by plaintiffs and as now stated by the plaintiffs in their briefs upon this trial in substance, is as follows:

On or about August 15, 1919, Holder and Hamilton, representing plaintiffs, called at the office of the defendant corporation and met Farquhar. Defendants William M. Baldwin and Stevens were present and Van Pelt part of the time. Holder and Hamilton had come because Hamilton, one of plaintiffs' " customers' men," was anxious to learn the conditions with regard to the company so he could answer inquiries of customers. Farquhar explained that neither he nor the other directors had any desire to create a market for the stock, that they would not sell it because they wanted to hold it and reap the profits to come. Farquhar told Holder that for the first six months of 1919 the profits were $400,000, and that the profits for the year would be $900,000. Farquhar stated that all the capital expenses of the company had been provided for, but that the company was considering the building of refrigerator steamers; that the company had $1,000,000 worth of preferred stock authorized but not issued which would cover the cost of these steamers; that there was no difficulty about selling the stock; that as Richardson, Hill & Co. were showing an interest he inquired if the plaintiffs would want to buy and handle such an issue. He referred to the " Colombian proposition," which, if the defendant corporation went into it, would require $1,000,000, which would be raised by an increase in the capital stock. Holder recalled that inasmuch as Farquhar had suggested the matter he would look into it. Farquhar said he had no certified balance sheet as of June thirtieth, but he stated that the balance sheet would show profits of $400,000 for the first six months. Holder then stated that the stock was not on a dividend basis and the plaintiffs would not be interested in it unless it was a dividend paying stock, to which Farquhar replied that the stock could be put on a dividend basis; that the earnings warranted payment of a dividend and that as a matter of fact he had already approached some of the larger stockholders of the company to see if they favored paying a dividend. Farquhar referred to a

letter sent to stockholders, asking them whether they would take common stock at $50 per share in payment of dividends. Holder stated that he could not pass on the question of purchase as quickly as he might in other cases because as a rule Richardson, Hill & Co. would sell no stock in companies which they had not thoroughly and personally investigated, and that it was manifestly impossible to go to Paraguay to investigate defendant corporation. About August 25 (probably August 23), 1919, Farquhar came to Boston and saw Gurnett with the idea of interesting Gurnett and getting him to handle an issue of the preferred stock of the International Products Company. Farquhar at this interview exhibited a paper showing actual earnings on cattle and quebracho for the five weeks ending August 2, 1919, of $98,810.20. Farquhar told Gurnett that the preferred stock of defendant corporation theretofore issued had been sold for cash at par and that the defendant corporation was now seeking to sell some of its stock for the purpose of buying an interest in the Colombia Products Company and of raising money to build two refrigerator boats. Gurnett pointed out that plaintiffs would not be interested in any stock which was not permanently established on a dividend basis, to which Farquhar replied that the directors had voted to pay all accumulated dividends on the preferred stock of the company for the past two years. Gurnett told Farquhar that he was impressed with the showing the company had made and that he would take the matter up further with Farquhar upon his return from a trip which he was about to make to the West. On or about September third or fourth Farquhar had a conference with Putnam in New York, in which Farquhar stated that the net earnings for the first six months of 1919 were upwards of $350,000, and that the earnings for the first five weeks of the second six months were upwards of $98,000. He referred to the fact that the directors had declared payable all back dividends up to and including June 30, 1919, and that this had been done out of earnings for the first six months of 1919; that originally it had been planned to pay these dividends in cash, but so many of the directors wanted more stock that they were going to offer stockholders an opportunity to take that dividend in common stock at $50 or in cash, at their election, and that the majority of the directors had elected to take it in stock. Putnam and Farquhar went to lunch and there McKean joined them. The statements made in the morning were repeated by Farquhar, including the dividend situation and the earnings for 1919. On or about September fifth there was a meeting between Holder, representing the plaintiffs, and defendants Farquhar and William M. Baldwin. At this interview Farquhar referred to a cable he had

received that morning giving the profits of the extract plant and the packing plant for the five weeks ending August 2, 1919, showing net profits for this period from these branches of the business of about $98,000, and he stated that these figures would be increased when the final figures were received, because the canned meat had been taken at only ninety per cent of its estimated selling price and the profit from the fattening of cattle had not been included. He stated, according to his own admissions, that the company had earned from the start of operations up to June 30, 1919, over $400,000. As a result of the interviews defendant had been holding up to this point, Holder requested Farquhar to prepare something in the nature of a prospectus covering the statements he had theretofore made, and on September 8, 1919, Farquhar, in response to this request, delivered to the plaintiffs plaintiffs' Exhibit 79, in which it is stated: " 1919 — Earnings. The net profit on meat and by-products manufactured, cattle held and fattened and quebracho extract manufactured to June 30, shows $300,000. The profit on the second half of this year, with the output as above, which is much within the capacities of the plants, should show upwards of $600,000, or a total for 1919 of more than $900,000."

As a result of the numerous interviews which he had, some of which have been referred to above, Holder on September 24, 1919, prepared a written statement of the representations which had been made to him in the course of the conferences. This statement is in evidence as plaintiffs' Exhibit 153. At the October first conference there were present Farquhar, Gurnett, Putnam, McKean and Hubbard. Prior to this conference Holder had gone over the matter fully with Gurnett, who had returned from the West and had discussed with him the various communications received from the defendant corporation hereinbefore referred to. Farquhar referred to his conversation with Gurnett prior to Gurnett's leaving for the West, and reminded Gurnett that on that occasion there had not been time to go into the matter in detail. He stated that he wanted Gurnett to be informed of the business of the company " because he wanted to interest Richardson, Hill & Co. in the preferred stock." He stated that the quebracho end of the business had already earned a large sum of money and that the company was making " positive definite earnings on the capital and the slaughtering of cattle, and that by the issuance of $1,000,000, approximately $1,500,000 of preferred stock, and the purchase of an interest in the Colombian Company and the building of two refrigerator boats, these earnings could be doubled, in fact he thought tripled."

Gurnett at this conference on October first referred to the recent

payment of dividends and the fact that they had been paid largely in stock and not in cash, and indicated that this circumstance was in his opinion adverse, to which Farquhar replied that the reason the stockholders had taken the stock dividend was because they believed the stock was very cheap and they would rather have it at this time than cash. Farquhar stated that the purpose of selling the stock was to raise money with which to purchase refrigerator boats; that the earnings which the company was then showing were large, as shown by recent cable representations from Paraguay, and was sufficient to pay this dividend on the preferred stock and leave a balance of about four dollars a share on the common stock; that this accounted for the desire of some of the directors to own common stock; that the company had absolutely no necessity for any working capital beyond what they already had; that the money to be raised by the sale of stock to plaintiffs was not to be used for working capital, but only for the acquisition of a sixty per cent interest in the Colombian Products Company and the building of two refrigerator boats. Farquhar referred to the fact that the company had a revolving meat credit, which was self-liquidating, and also a right to draw on the National City Bank at Buenos Aires for the purpose of purchasing cattle; that the credit with the National City Bank had not been used and was still available. Gurnett pointed out that the money sought to be raised by the sale of stock to Richardson, Hill & Co. would not be sufficient to purchase a sixty per cent interest in the Colombian Products Company and two refrigerator boats, and Farquhar explained that he had already arranged to raise the balance necessary by the sale of common stock to W. F. Ladd & Co. On the question of dividends Farquhar said: " There is no question of a dividend. The directors have just paid it recently, as you know all of the accrued dividends on the preferred stock and the dividend on the preferred stock is definitely established as a 7 per cent. stock." The question of a second quebracho unit was discussed and Farquhar stated that this had been arranged for without depleting present working capital. Farquhar at the conference of October first stated that for the first five weeks of the second six months of 1919 the company had made $19,000 on quebracho alone; that the company had earned for the first nine months of the year in excess of $500,000. In referring to the mortgage held by the American International Corporation he stated that this mortgage was a mortgage on land and not on the cattle and that the cattle were absolutely free and unincumbered. At the conclusion of the conference Gurnett, relying on the representations, agreed on behalf of the plaintiffs to purchase 10,000

shares of the preferred stock of the defendant corporation at $72.50, with an option of sixty days to purchase all or any part of an additional 10,000 shares at the same price.

The foregoing statement is briefly the plaintiffs' version of the alleged representations made by defendants to plaintiffs.

The representations referred to in the plaintiffs' complaint and in the foregoing negotiations related in the testimony given on behalf of plaintiffs may be considered conveniently for the purposes of this discussion under three classes, viz.: 1. Representations in the declaration of dividends. 2. Representations as to the financial condition of the company other than those involved in the declaration of dividends. 3. Representations as to the physical properties in Paraguay.

As to plaintiffs' claims based on the declarations of dividends, I will first discuss the dividend declared on August 19, 1919, covering all accumulations on preferred stock to June 30, 1919. On about August 12, 1919, it appears that the following notice was sent to stockholders of record by defendant corporation:

" INTERNATIONAL PRODUCTS COMPANY,
" 120 Broadway
" NEW YORK, *August* 12, 1919.

" To Stockholders: It has been suggested that we pay off, out of earnings, the accumulated dividends on the preferred shares of the company up to June 30, 1919, in common stock at $50 per share, and it is possible that the directors may consider this action at the present time provided they have in advance sufficient assurance that such course would be generally deemed to be a desirable one to stockholders. Please express your approval of this plan by signing and returning to the company the inclosed agreement.

" Yours very truly,
" PERCIVAL FARQUHAR,
" *Vice-President.*"

On the 18th of August, 1919, there was a meeting of the executive committee of defendant corporation. The record shows that those present were Farquhar, William M. Baldwin and defendant Henry, members of the committee, and also the treasurer, Stevens, and defendant Van Pelt. Mr. Olney, who acted as secretary of the meeting, was also present. At this meeting the chairman reported: " That the holders of approximately 93 per cent. of the preferred stock had signed an agreement to accept common stock at the rate of $50 per share in payment of all dividends accumulated on their preferred stock up to June 30, 1919. The chairman submitted

to the meeting a balance sheet of the company prepared by Price, Waterhouse & Company, and given in full by Cable No. 803, received August 8, 1919, according to which the surplus and net profits of the company as of December 28, 1918, were $349,000. He also submitted an estimate prepared by the company accountant showing additional net earnings for the succeeding period of six months, namely, to January 28, 1919, of $178,951.58 (exclusive of cattle fattening), making a total surplus and net profits up to June 30, 1919, of $527,951.58."

The board of directors on the next day, viz., August 19, 1919, held a meeting, at which were present the defendants William H. Baldwin, Berwind, Chipp, Farquhar, Henry, Keith, Olney, Stevens and Van Pelt. At this meeting it was unanimously " resolved that all dividends accumulated upon the outstanding preferred stock of the company up to June 30, 1919, be and they hereby are declared payable to the holders of such preferred stock according to the books of record of transfer and registration of the company."

Pursuant to this resolution, proposed by William M. Baldwin and seconded by Henry, dividends in the amount of $356,452.25 were paid. The record shows that this dividend was declared upon cabled figures received from Paraguay for the year 1918 (plaintiff's Exhibit 37) and an estimate of profits prepared by the accountants in New York for the first six months of 1919, purporting to show: " Estimated surplus and undivided profits June 28, 1919, $527,951.58 " (plaintiff's Exhibit 38). I am satisfied from careful examination of the evidence in this case, particularly the reports of the accountants of defendant company, viz., Price, Waterhouse & Co.; that as a matter of fact at the close of the period for which the dividend was declared and paid, defendant corporation had no actual surplus earnings. The declaration, therefore, of the dividend included the representation that the corporation then had surplus earnings in an amount sufficient to cover the dividend and this representation was incorrect and not true. Plaintiffs' Exhibits 167 and 168 are most enlightening upon this part of the case. They are the reports of Price, Waterhouse & Co. on the Central Products Company and the International Products Company for the period December 30, 1918, to June 28, 1919. They seem to reflect the true condition of the defendant corporation on June 30, 1919. They establish conclusively in my opinion the fact that the profits estimated by the accountant in New York for the first six months of 1919 were never realized. Instead of a profit of $197,705.85 in Central Products Company, and a profit of $64,816.92 in International Products Company, as estimated, there was in fact a loss of $14,402.63, United States gold, in Central

Products Company, and $136,552.92, United States gold, in International Products Company for this period. Exhibit 167 bears the title: " Central Products Co., Asuncion, Paraguay, Balance Sheet and Profit and Loss Account, December 30, 1918, to June 28, 1919." It was prepared by Price, Waterhouse & Co. and W. B. Peat. The report was made in South America and was addressed to Messrs. Price, Waterhouse & Co., No. 54 William street. Attached to the report itself is Exhibit A, in evidence as plaintiffs' Exhibit 41. It contains the following notation: " Loss for period December 30, 1918, to June 28, 1919, as per Exhibit B, $32,733.25. According to the conceded rate of exchange such loss would be $14,402.63. The plaintiffs' Exhibit 168 is a part of the report of the accountants for the same period. Both exhibits 167 and 168, which are dated June 15, 1920, begin with the following comment: " We have now completed our examination of the books and accounts of the International Products Company kept in Asuncion, Paraguay, for the period from December 30, 1918, to June 28, 1919, relating to the operation of a Quebracho extract plant and camp stores, etc., at Puerto Pinasco and have prepared therefrom the following statements which are attached hereto, namely."

It will be noted, therefore, that these reports of accountants were made after an apparent complete study of defendant's records. Plaintiffs' Exhibit 168 bears the following title: " International Products Co., Asuncion, Paraguay. Balance Sheet & Profit & Loss Account December 30, 1918 — June 28, 1919."

Plaintiffs' Exhibit 40, which is attached to plaintiffs' Exhibit 168, contains the following notation: " Loss for period December 30, 1918, to June 28, 1919, $310,347.54." This amount translated into American gold at prevailing rate of exchange is $136,552.92. Even, therefore, if it should be assumed that as stated in the report of the chairman of the executive committee, made at the meeting of August 18, 1919, the defendant company did start the year 1919 with a surplus of $349,000 from 1918, its net surplus on June 30, 1919, would be approximately $114,473.26, arrived at as follows: Assumed profit carried over from 1918, $349,000; less interest on bonds, interest on loans and premium on bonds retired (plaintiffs' Exhibit 38), $85,571.19; loss in Central Products Co., $14,402.63; loss in International Products Company, $136,552.92; total losses, $234,526.74, leaving surplus and net profits June 30, 1919, $114,473.26.

Defendant corporation claims that by this process the sum of $83,571.19 is being used as a deduction twice, claiming further in its brief that said sum was deducted before the profit of $349,000

was arrived at. The $349,000, however, as I understand it, is alleged surplus carried over from 1918, and was not earnings for 1919.

The dividend declared on August 19, 1919, was, as above noted, $356,452.25, away in excess of the surplus net profits on June 30, 1919, from a very favorable calculation of defendant's assets. A careful reading, however, of the reports of Price, Waterhouse & Co. and W. B. Peat in evidence made on Central Products Company and International Products Company for the period to the close of the year 1918, defendants' Exhibits H-8 and I-8, have convinced me that the assumed surplus of $349,000 did not actually exist. Plaintiffs' Exhibit 51, which is Exhibit A attached to defendants' Exhibit H-8, shows a surplus in Central Products Company at the close of 1918 of $798,672.48, Argentine paper. The notation appearing on said Exhibit A is as follows: " Surplus on Live Stock, etc., as per Profit and Loss Account, Exhibit B, $798,672.48." It is this figure translated into United States gold which is the $349,000, the assumed surplus carried over from 1918. The reports of the accountants upon even a most casual analysis show that as a result of the operations of Central Products Company up to the close of 1918 there was no such surplus. Defendants' Exhibit H-8 is entitled: " Report, Balance Sheet and Profit and Loss Account, August 1, 1917, to December 30, 1918, of Central Products Company." The report is dated August 1, 1919. This alleged surplus apparently arises almost entirely from book entries respecting the alleged increase in the value of cattle on the hoof. It is not claimed that the cattle were actually weighed. They were apparently assumed to be heavier because they had grown older and their weight increased. At the trial, moreover, the following testimony was given by Mr. Farquhar: " Q. Now you realize, do you not, that in making up this estimated surplus and undivided profits of June 28, 1919, of $527,951.58, that that was composed of surplus and net earnings, December 28, 1918, of $349,000? A. Yes. Q. And the other figure that makes up that total of $178,951.58, was the estimated profits for the first six months? A. Yes; on canned meat and quebracho extract. Q. And this item of $349,000 — that was the item carried over to the fattening of cattle, as surplus from 1918, wasn't it? A. Breeding — the business of the cattle department — breeding and fattening of cattle. Q. Well, except for a very small portion, that was an item due, wasn't it, as you understood, to the fattening of cattle? A. And breeding. Q. What? A. And breeding; increased age and weight. Q. Exactly; increased age and weight. You didn't understand that that profit had accrued from sales actually made, but

from an estimate of the increased value of the cattle? A. And inventory of the increase. Q. Well, an inventory of the increased value of the cattle? A. Yes. Q. Not from actual sales of cattle made and money taken in? A. No. Q. So that in voting for this dividend in August, 1919, you regarded these inventory estimates or valuations of the profits of the cattle department as an earning actually made, didn't you? A. Breeding, increased weight, fattening inventory. By the Court: Q. Did you consider that as earnings of the company? A. Based on the chartered accountant's reports and the lawyers' advice. Q. Irrespective of what it was based on, did you yourself consider it as earnings of the company? That is what the Judge wants to know. A. Yes. By Mr. Seabury: Q. And you realized, did you not, when you voted for this dividend, if that item of $349,000 was not properly to be regarded as earnings, that then you did not have earnings sufficient to pay the dividends of $356,000? A. But we did regard it as earnings."

It would seem to me that this alleged increase in value of cattle not realized by an actual sale of cattle is not a proper item to be taken into consideration in determining actual surplus of a going concern. (*Hutchinson* v. *Curtiss*, 45 Misc. 484; *Southern California Home Builders* v. *Young*, 45 Cal. App. 679; 188 Pac. 586; *Sexton* v. *Percival Co.*, 189 Iowa, 586; 177 N. W. 83; *Kingston* v. *Home Life Insurance Co. of America*, 11 Del. Ch. 258; 101 Atl. 898.)

Furthermore, in the accounts of this period many of the losses sustained in operation were capitalized by carrying them to the construction account. These losses aggregate $289,344.43, Argentine money. This item appears on Exhibit E of defendants' Exhibit H-8. Some of those expenses were for " protection, auto repairs, general expenses, charities, gifts, entertainment," etc. Irrespective of what causes may have been instrumental in bringing about this alleged surplus of $349,000, which was carried over from 1918, the facts indicate to me that such surplus did not exist. The representation of the company made through the declaration of such dividend, that the surplus and net profits were at least equal to the dividend declared, was, therefore, in my opinion, a material misrepresentation. On September 3, 1919, notice was sent to all stockholders of the declaration of the dividend and to the effect that same was payable to stockholders of preferred stock of the company as appears from the records of the company at the close of business on September 9, 1919. On September third Farquhar, as vice-president of the company, sent a letter to the plaintiffs (plaintiffs' Exhibit 15), heretofore referred to in Gurnett's testimony, and with such letter he inclosed plaintiffs' Exhibit 16. On September thirtieth the defendant corporation, by the defend-

ant Stevens, as treasurer, sent out a notice to stockholders, including plaintiffs, advising them as follows: " Referring to your recent agreement to accept common stock of this company at the rate of $50 per share in payment of dividends accumulated up to June 30, 1919, upon the preferred stock of the company, we are prepared to deliver to you certificate for common stock representing the amount of such dividends due upon preferred stock standing in your name on September 9, 1919, with such check, if any, as may be additionally due to complete the amount of dividends in cash having credited you with the total amount and charged you with the amount of common stock at the rate specified on subscription account. Such certificate, with check, if any, will be sent you upon our due receipt for cancellation of the certificate of obligation held by you representing the amount of the dividends."

There is no question, therefore, but that in this notice to all stockholders the representation was made and repeated that the company had sufficient surplus to cover at least the amount of the dividends that had accumulated on the preferred stock of the defendant company.

On December 30, 1919, the board of directors of the defendant corporation declared a dividend for the six months' period ending December 31, 1919. This meeting of the directors was preceded by a meeting of the executive committee of defendant corporation on December 10, 1919. At the meeting of the executive committee there were present William M. Baldwin, Henry and Keith, constituting that committee. There were also present defendants Stevens (vice-president) and Streeter. The executive committee unanimously adopted the following resolution:

" *Resolved,* that ·the executive committee recommend to the directors that whenever after January 1, 1920, *upon receipt of final figures from Paraguay, certified to by chartered accountants,* it is found that the company has earned its preferred dividend for the last half of the year 1919, that such dividend be paid."

At the meeting of December 30, 1919, of the board of directors heretofore referred to there were present defendants William M. Baldwin, Stevens, George G. Baldwin, Berwind, Chipp, Henry, Keith, Olney and Van Pelt. The minutes of this meeting, in part, read as follows: " A statement of the profit and loss account as of December 27, 1919, was submitted to the meeting showing $484,387.64 as the net earnings of the company for the twelve months ending December 27, 1919, and that this amount with undivided profits of $351,415.90 on December 28, 1918, made a total of $835,803.54, which, after a deduction of $356,452.25, paid as preferred stock dividend to June 30, 1919, left $479,351.29 as the

estimated surplus available for dividends, the amount shown on the statement to be required for a preferred stock dividend for the six months ending December 31, 1919, being $146,912. An approximate consolidated balance sheet as of September 27, 1919, was also submitted to the meeting. On motion, made by Mr. Berwind and seconded by Mr. Keith, it was unanimously *Resolved*, that all dividends accumulated upon the preferred stock of The International Products Company up to January 1, 1920, namely, 3½ per cent. for the six months period ending December 31, 1919, be and they hereby are, declared payable on January 10, 1920, to the holders of the said preferred stock, according to the company's books and records of transfer and registration at the close of business on January 3, 1920 * * *."

The profit and loss account as of December 27, 1919, referred to in the foregoing extract from the minutes of the board of directors of the defendant company, is in evidence and states on its face that it is an estimate. I am satisfied from careful reading of the evidence in the case, particularly the reports of the chartered accountants, that the representation involving the declaration of this dividend, to the effect that the corporation then had surplus earnings in amount sufficient to cover the dividend, was not true. The actual financial condition of defendant corporation at the close of 1919 appears from the report in evidence of Price, Waterhouse & Co. on Cia Internationale de Productis for the period of June 30, 1919, to December 27, 1919. This company was formed for the purpose of acquiring the Paraguay property and assets of the Central Products Company and of leasing those of the International Products Company. From the time of its organization the Central Products Company conducted the meat business, whereas the International Products Company conducted the quebracho business. It was on July 1, 1919, that the Paraguay company, known as the Cia Internationale de Productis, was organized to take over the business of both. Farquhar testified upon this subject as follows: " Q. And that continued until the beginning of the second six months in 1919, did it not when the Cia Internationale de Productis came into existence? A. Yes. Q. And that new corporation conducted both branches of the business theretofore conducted, did it not? A. Yes. Q. The business formerly conducted in the meat packing by the Central Products and the business formerly conducted by the International Products Company in the quebracho? A. Yes."

Plaintiffs' Exhibits 52 and 47, which are sub-Exhibit A of defendants' Exhibit Q-8, are the balance sheets of the Cia Internationale de Productis for the last six months of 1919. These

show that the Cia Internationale de Productis operated at a loss as per Exhibit B. The following notation appears in the list of assets of that company: " Loss period from June 30, to December 27, 1919, as per Exhibit B, $2,434,808.54." This figure is in Argentine paper; translated into United States gold the above amount becomes a loss of $1,034,793.62. This report upon the affairs of the Cia Internationale de Productis Company by Price, Waterhouse & Co. and W. B. Peat is dated June 15, 1920, and begins with the following introductory statement: " We have now completed our examination of the books and accounts of the above company for the period from June 30 to December 27, 1919, relating to the operation of a packing plant at San Antonio, a quebracho extract plant at Puerto Pinasco, various estancias, boat line, camp stores, etc., and have prepared therefrom the following statements which are attached hereto, namely: Exhibit A, balance sheet as of December 27, 1919; B, general profit and loss account for the period June 30 to December 27, 1919."

I am satisfied, therefore, from examination of the report of the accountants, as well as a review of all the testimony in the case, that no matter how interpreted the actual proof shows that at the time the directors declared a dividend of $146,912 for the last six months of 1919 the defendant corporation did not possess an actual surplus, but really had a large deficit.

In reaching this conclusion I have given full consideration to the testimony of the expert accountant Brison, who testified on behalf of defendants in support of defendants' claim that there was at the time of declaration of both the dividends a surplus in the company more than sufficient to warrant the declaration of such dividends. In other words, defendants point out that notwithstanding plaintiffs' Exhibits 40 and 41 and plaintiffs' Exhibits 47 and 52, the financial condition of defendant corporation on August 19, 1919, and December 30, 1919, was such as to have legally justified and warranted the dividends respectively declared on those dates. Brison is connected with Price, Waterhouse & Co. and testified as an expert accountant. He stated that the period during which the plaintiffs were negotiating with defendants was part of the development period of defendant company and that during such a period in the life of a corporation such as is defendant it is customary that interest on bonds and like charges, losses of various natures and charges for concessions should be charged to capital. On this basis defendants claim the company had a surplus on June 28, 1919, of $728,491.42 (defendants' Exhibit R-8 for identification), much in excess of the dividend of $356,452.25

declared on August nineteenth, and which was almost entirely paid in common stock. On the same basis, defendants claim that on December 27, 1919, there was a surplus of $499,916.36 (Exhibit S-8 for identification) and more than sufficient to pay the dividend declared on December 30, 1919, amounting to $142,790.27. Exhibits R-8 and S-8 for identification are the compilations of Brison's testimony on his interpretation of the reports and statements which he claims were the basis of his testimony.

It will be noted, however, with respect to Mr. Brison that while the defendant company operated in Paraguay he was never there. He never saw or participated in any of the operations of the company. He never saw any of its property or assets in South America. He apparently never audited or ever saw the South American books of the company, which are the only books of original entry with respect to operations. He practically admitted that by his method of computation the surplus of the defendant corporation would increase directly with the increase of its losses. Brison, however, did admit that the right to capitalize losses depended upon the facts and circumstances surrounding each particular item. He admitted practically, furthermore, that he had no knowledge of any of the affairs of the company in Paraguay, but still he attempted to capitalize many losses which it will be noted the company's auditors, on the scene and familiar with all the facts, did not see fit to capitalize. There can be no question but that there are certain expenditures which result in assets which are not tangible property, as, for instance, money spent in establishing good will, but I am of opinion there is no legal justification for taking credit in this way for money spent on property dissipated under circumstances which gave no corresponding increase to the value of the assets, as, for instance, depreciation and loss due to unprofitable operation. As I have heretofore noted, I have given every possible consideration to Brison's testimony, but I am finally of the opinion that on the dates the dividends were respectively declared the company lacked sufficient surplus to legally justify such dividends. The company, therefore, declared a dividend on August 19, 1919, when it had no legal right to do so and the defendant company is, therefore, liable for the ordinary and natural consequences of such illegal act. "A declaration of a dividend by a going concern implies earnings from which to pay it, and the publication of the fact of such declaration is certainly calculated to induce the public to believe that the dividend has been earned and that the corporation is prosperous. If, intending the public to act thereon, the defendants had made and published a report expressly stating that the dividend declared had been earned,

there would be no doubt of their liability to a person thereby deceived to his injury." (See dissenting opinion of Mr. Justice MILLER in *Ottinger* v. *Bennett*, 144 App. Div. 525, 533, upon which the Court of Appeals reversed, 203 N. Y. 554.) I am convinced moreover from the evidence that the declaration of the dividend of August 19, 1919, was a material inducing cause for plaintiffs' entering into the contract of October 2, 1919.

The situation with respect to the dividend of December 30, 1919, seems to be somewhat different. It is apparent that the declaration of a dividend on December 30, 1919, could not induce a contract of October 2, 1919. Furthermore, Gurnett testified as follows: " Q. So, of course, the declaration of that dividend on the 30th day of December, 1919, did not influence you when you entered into the original contract of October 2, 1919, did it? A. No, sir. Q. And it did not influence you when you exercised your option on the 17th day of November, 1919? A. No, sir. Q. And at that time your entire financial commitment was made, was it not? You never increased it, did you? A. The entire commitment was made at that time."

Gurnett also testified: " Q. Now this switching from preferred stock to common stock was at your own suggestion? A. Yes, sir. Q. And for your benefit? A. Yes, sir. Q. Nobody on the part of the company suggested it? A. No, sir. Q. So there was nothing in the declaration of this dividend, the second dividend at the end of the year 1919, that in any manner affected this switching from preferred to common? A. No, sir."

Hence, it cannot properly be claimed by plaintiffs that the declaration of the dividend of December 30, 1919, could have induced the contract of October 2, 1919, or caused plaintiffs to seek a substitution of 22,800 shares of common stock for the 8,000 shares of the preferred stock, which arrangement was consummated on March 22, 1920. Furthermore, apparently plaintiffs do not claim that they were damaged by this substitution which was made at their instance upon the basis of twenty-five dollars per share for the common, nor could they, because the common stock apparently was then selling in the market at about twenty-eight dollars per share.

So far as the defendant company is concerned, therefore, I am of the opinion that the declaration of the dividend on August 19, 1919, was a representation of such a material fact as would require favorable action on plaintiffs' prayer for rescission of the contract of October 2, 1919, if such right of plaintiffs was not waived or lost by certain acts and conduct on plaintiffs' part which the defendants claim constitute a complete defense to the entire cause

of action. The effect of plaintiffs' course of action and of what plaintiffs did or failed to do will be hereinafter discussed.

The second class of representations testified to by plaintiffs are the representations relating to the financial condition of the company other than those included in the declaration of dividends. In plaintiffs' brief the alleged representations of this class have been divided into six subclasses of representations alleged to have been inducing causes for the making of the contract of October 2, 1919. They are stated by plaintiffs as follows: (a) That the company was in a strong financial condition, needed no money for working capital and was selling its stock only to raise funds for the purpose of going into the Colombian proposition and purchasing refrigerator boats; (b) that for the first six months of 1919 the company had earned upwards of $350,000, and for the whole year $900,000; (c) that the cattle were free and unincumbered; (d) that the company had not had occasion to use any of the National City Bank credit and that the whole thereof was still available for the purchase of cattle; (e) that all of the defendant corporation's preferred stock, excepting $700,000 thereof, had been sold for cash; (f) that all of the defendant corporation's bonds had been sold for cash at par. As to subclass (a), as to the alleged representation that the company was in a strong financial condition, it is claimed that it was represented to plaintiffs that the company not only was in such a position, but that it was selling stock to plaintiffs only to raise funds for the purpose of going into the so-called Columbian proposition and purchasing the refrigerator boats. As to the company's actual financial position, it must be admitted from the record before me that the company almost continually was in need of money for the various purposes of the corporation. It does indeed seem, however, that such statements as were made concerning the financial condition of the company in August, 1919, and for the period prior to the date of the contract and in the declaration of the dividends were based upon such reports and estimates as were available to Farquhar and the other defendants at such period in 1919. If such reports and estimates had been correct, then there would seem to be some warrant and justification for a representation that the company's financial position was strong. As has been pointed out, however, the final reports submitted by the company's auditors indicated that no actual surplus had been carried over from 1918, and that there were no actual profits for 1919. I do not believe, however, that there was any statement made by Farquhar or any other defendant concerning the soundness of the company's financial position, other than that involved in the declaration of dividends, that would

justify a conclusion that there was a separate and distinct representation as to the soundness of defendants' financial position, which was actually one of the inducing causes for the contract of October 2, 1919. The company seems to have had a credit against live stock for $1,800,000, a credit for $950,000 for meat and a credit of $950,000 for quebracho. The fact that loans could be increased by the South American Bank further indicated some apparent soundness at least in the company's financial position. Of course, at the time, there were so-called overdrafts, but I do not think that fact was particularly significant, because even Gurnett stated: " This is a different kind of overdrawing on a bank. I should not consider this in the ordinary term overdrawing one's account. I would consider this a loan." As to the claim that defendants represented that a definite and regular dividend policy had been declared and decided upon, from which an inference is apparently to be drawn that the company was on a permanent dividend basis, it is difficult to perceive how such a representation, even if made, could have been an inducing cause for the making of the contract to purchase defendants' stock. I do not see how any reasonable person of the experience in financial affairs possessed by the plaintiffs could believe that any corporation could permanently or definitely be on a dividend basis, since declaration of dividends is dependent upon the financial condition of a corporation, when the advisability of a dividend at any particular time may be under consideration. Farquhar no doubt did make rosy statements as to the company's plans present and future, and to past achievements, but I do not think that such statements could properly be classed as misrepresentations that would justify the rescission of the contract. Moreover, many of his statements along this line were clearly of a promissory character. Furthermore, I am not satisfied from the evidence that it was actually represented to the plaintiffs that the money they were to contribute was to take care of the Colombian proposition and to purchase refrigerator boats.

As to subclass (b) plaintiffs claim that for the first six months of 1919 it was represented that the company had earned upward of $350,000 and for the year 1919 the sum of $900,000. It is to be noted in connection with this alleged representation that the complaint upon this subject, in paragraph 75, states as follows: " The defendants stated and represented that a truthful and careful estimate of the net earnings of the defendant corporation on meat and by-products and on cattle and quebracho extract from the start of operations to December 31, 1919, was $900,000." Paragraph 79 states: " The defendants stated and represented that the net profits from the packing plant and cattle department of

defendant corporation from the start of operations to June 30, 1919, was approximately $300,000." Paragraph 80 states: " The defendants stated and represented that a truthful and careful estimate of the net earnings of the defendant corporation from its cattle and packing plant for the latter half of 1919 was $350,000." I am unable to find any allegation in the complaint containing the alleged representation that for the six months of 1919 the company had earned upwards of $350,000. At' any rate, the alleged representation which is discussed under this heading seems to have been involved in the situation which has been discussed in connection with the declaration of dividends. I am satisfied that for the year 1919 the company did not actually make money and there was no actual profit, and I am satisfied, as I have heretofore stated, that no actual surplus was carried over from 1918. Having reached a conclusion with respect to the declaration of the dividends, I do not believe that any further discussion of the second subclass of alleged misrepresentations is necessary.

As to subclasses (c) and (d), which include representations that the cattle were free and unincumbered, and that the National City Bank credit had not been used and the whole thereof was still available, the documentary evidence in this cause, particularly plaintiffs' Exhibit 53, defendants' Exhibit H-8, plaintiffs' Exhibit 167 (p. 14), plaintiffs' Exhibit 55, plaintiffs' Exhibit 58, plaintiffs' Exhibit 59 and plaintiffs' Exhibits 60 and 61, have established to my mind clearly that the cattle were not free and unincumbered, but on the contrary from early 1918 had been pledged to the National City Bank as " guarantee " for the repayment of overdrafts. I am not satisfied from the evidence, however, that it was actually represented that the cattle were free and unincumbered. I do not believe, moreover, that it was of much moment whether the revolving credit was or was not a lien against the cattle. It was a credit and it gave the loaning bank an obligation against the company, even though it was simply an open book account, superior to the preferred stock. Such obligation must be paid in full before any amount could be paid on the preferred stock. As to the alleged representation that the company had not had occasion to use any of the National City Bank credit, it is to be noted that such representation does not appear to be alleged in the complaint. At any rate, it is specifically denied by Farquhar, and I am not satisfied, moreover, from the evidence that such representation was actually made.

As to subclass (e), we are now considering the representation that all of the preferred stock of the defendant corporation excepting $700,000 had been sold for cash. I am not satisfied from the

evidence that plaintiff has carried out the burden of proving that such representation was actually made. It further seems evident from such information as Holder and Gurnett possessed by October 1, 1919, that they were quite familiar with many, if not most, of the important circumstances connected with the prior issue and sales of defendant corporation's preferred stock.

As to subclass (f), viz., the representation that all the common bonds of the defendant corporation had been sold for cash at par. In proof of this alleged representation plaintiffs point out that although the American International Corporation paid the defendant corporation $1,300,000 they received therefor not only $1,300,000 face amount of bonds, but in addition thereto 1,562 shares of the stock of the defendant corporation. In its brief plaintiffs state " this was admitted at the trial, but in answer thereto it was claimed that the stock so delivered to the American International Corporation was not given by the defendant corporation, but by Farquhar, and the representation, it was claimed, was, therefore, technically true." It does seem from the evidence to be a fact that the American International Company did receive the above 1,562 shares of the stock of the defendant corporation. Furthermore, it would seem that plaintiffs had knowledge of the fact that a bonus had actually been given to the American International Corporation. In Holder's memorandum, Exhibit 153, claimed to be his statement of the representations made to him, and which memorandum he testified he prepared on September twenty-fourth, he stated as follows at page 2: " I presume Mr. Farquhar received in addition considerable common stock and that the American International, Inc., when purchasing the notes of the company and also purchasing preferred stock received as a bonus in common which might have been approximately the same as these other founders, although as their holdings of common are, as I understand it, partly held in the block of 36,770 standing in the name of Mr. Farquhar, the stock records give no inkling as to what bonus they may have received." In view of this contemporaneous memorandum of the conversation with Mr. Farquhar, it appears that before entering into the deal plaintiffs had knowledge of the fact that a bonus had been given with the bonds.

The third main class of representations which the plaintiff claims were made by defendants were those relating to the physical condition of the properties in Paraguay. These alleged representations have been classified by plaintiffs as misrepresentations to the following: (a) The quantity of quebracho wood on the property; (b) climatic conditions; (c) the acreage and the proportion thereof available for grazing; (d) the quebracho extract plant and its

operations.    Each of these alleged misrepresentations will now be discussed.

As to the quantity of quebracho wood on the property, plaintiffs claim that they were told that defendant's property contained about 2,000,000 tons of good, merchantable quebracho wood.    The allegation of the complaint, however, with respect to this alleged representation, is contained in paragraph 30, which reads as follows: " The defendants stated and represented that the defendant corporation had acquired upwards of 1,000,000 acres of land in the chaco of Paraguay, partly in quebracho forests, which experts had found to contain about 2,000,000 tons of good, merchantable quebracho wood, and the balance in good pastures for the breeding and fattening of cattle."    A very large part of the time spent in the trial was consumed in receiving plaintiff's testimony in support of this representation, and defendants' rebuttal testimony concerning the same.    Kerr, who operated the quebracho plant of the defendants as its quebracho expert, testified at the trial for the plaintiffs and against defendants.    It appears that as early as March 6, 1918, he notified plaintiffs as follows (plaintiffs' Exhibit 146): " To begin with, and basing my remarks on personal observation and inquiry among those who might be in any way qualified to speak on the subject, there is very good reason to believe that the various representations and estimates of quebracho timber on these properties are of little, if any, value whatever, although I do not think there is any occasion for alarm or fear that the minimum quantity guessed at will not be realized (something less than 1,000,000 tons, I understand), for as a matter of fact it is just as liable to be double or treble this quantity as less."    From time to time Kerr made other reports to defendants which are referred to by plaintiffs as proof of the claimed misrepresentation as to the quantity of quebracho on the property.    I am convinced, however, that Kerr never made thorough exploration of all the defendants' properties, nor even of all of those to which defendants concededly had good title.    It is to be noted that the allegation of the complaint is that defendants stated that experts had found defendants' lands to contain about 2,000,000 tons of good, merchantable quebracho wood.    It appears from the evidence at the trial that Farquhar had before him the reports of Morris & Martin, 1,750,800 tons without Selvatica; Knight-Adkins on the Selvatica property, 600,000 tons, and other reports, including that of Ward, who had gone over part of the property and had been its manager. Assuming such representation was made, I do not think it was an exaggeration to state that experts had reported estimates of 2,000,000 tons.    Moreover, in view of the testimony of Morris

and Barbour, who had made explorations of defendants' properties, I am satisfied that an estimate of 2,000,000 tons was not beyond the truth. The alleged misrepresentation as to the quantity of quebracho wood, in my opinion, was not proven by the evidence at the trial, but seems to be disproven by the actual evidence in the record.

As to climatic conditions, plaintiffs claim it was represented to them that defendant corporation owned about 1,500,000 acres (2,500 square miles) of rich, well-watered cattle grazing lands and quebracho forests in the Paraguay River basin, and that the climatic conditions there were nearly perfect for the breeding and fattening of cattle. Plaintiffs contend that at times there is too much water on defendants' property, and at other times a condition of drought. In other words, the claim of plaintiffs is that the conditions, so far as climate is concerned, are far from favorable. Kerr was the main witness for plaintiff as to climatic conditions, and testified that they were absolutely unfavorable for the grazing of cattle. He was contradicted, however, by Tex Rickard and by Murdo MacKenzie, apparently men of qualification on this subject, and also by Barbour, Morris and Martin. I must, therefore, hold that as a matter of fact the alleged misrepresentation as to climatic conditions was not proven by the evidence.

As to the acreage and the proportion thereof available for grazing, plaintiffs claim that they were told that defendant corporation had 1,500,000 acres of land capable of grazing 200,000 head of cattle. In support of their claim the plaintiffs point out that assuming there were 1,686,653 acres of defendants' properties that, according to Levy, who reported in detail upon defendants' properties, only 977,258 were available for grazing and, allowing six acres to a steer, the above acreage would graze only 162,876 head of cattle. Plaintiffs, however, do not concede that defendants owned 1,668,583 acres. In their brief, however, plaintiffs do seem to concede that defendants did own 1,124,315 acres, as follows: Tract and acreage — Original Pinasco, 926,250; lot 70, 46,313; British Bank lands, 92,625; Postillion, 58,176; San Antonio, 951. Total, 1,124,315 acres.

It is to be noted, however, that the only alleged representation as to acreage found in the complaint is that in paragraphs 30 and 31, which total 1,060,000 acres so that plaintiffs by their own admission seem to credit defendants with owning at least as many acres as specified in the complaint. Furthermore, it appears from the evidence in the case that on September 3, 1919, plaintiffs were fully apprised by circulars to stockholders of the then holdings of defendants of less than 1,000,000 acres, viz., 987,000 acres. Plain-

tiffs' Exhibit 16 in the second paragraph thereof reads in part as follows: " The company owns 987,000 acres (with control over additional lands) of rich and well watered cattle grazing lands and quebracho forests in the Paraguay river valley where climatic conditions are nearly perfect for the breeding and fattening of beef cattle." In my opinion, therefore, the alleged misrepresentation as to defendants' acreage is not proven by the evidence.

As to the quebracho extract plant and its operation, plaintiffs claim that it was represented to the plaintiffs that the defendant corporation had a fully equipped modern quebracho plant at Pinasco which was then in operation and which had a capacity of 15,000 tons per year; that the plant was about to be doubled so as to give a capacity of 30,000 tons per year. Plaintiffs claim further that the talk about building a second unit was designed to mislead plaintiffs into believing that the first unit was in full operation, and even then was not large enough to turn out the extract which the wood available for treatment permitted and which the company's business required although the fact was well known to defendants that they did not have enough wood supply to keep even the first unit going. There seems to be no question but that defendants had one plant in operation and were planning to build a second unit. These facts must be conceded. It is true that Kerr reported that at the time of his report it would be inadvisable to build a second unit. I do not believe, however, that the plaintiffs seriously claimed any statement of Farquhar concerning the quebracho plant or plants was an inducing cause for the contract of October second. In my opinion, any statement of Farquhar as to the quebracho plant was not an inducing cause. There is a dispute as to just what was said about the quebracho plant, and the issue is a sharp one, Farquhar denying that he ever made any misrepresentation with respect to the quebracho plant and its operation. I am satisfied from the evidence that there was no such representation with respect to the quebracho plant and its operation as induced or helped to induce the making of the contract of October second.

As to the efficiency of the management of the defendant corporation, plaintiffs claim it was represented to them that the management of the defendant corporation was efficient, whereas such management was grossly inefficient. Defendants, however, point out that any statement as to the efficiency of management was more or less an expression of opinion. Kerr, the company's former manager of the extract plant, gave testimony that might warrant a conclusion that the management was not efficient, and I am led to believe that it cannot justly be claimed that the management

was efficient. However, I am further of the opinion that any alleged representation upon the subject of management was more or less the expression of an opinion and not very material in a consideration of what are just grounds for the equitable rescission of a contract to purchase stock of defendant corporation.

This completes the discussion of the representations which plaintiffs claim were material and false, and were inducing causes. I shall now proceed to consider the question of the liability of the individual defendants.

In my opinion, in view of the evidence in the case, none of the individual defendants are liable. As has been heretofore pointed out, Arthur A. Marsters and Catherine Marsters and the Guaranty Trust Company are out of the case, and so are defendants Sulzberger and Streeter. Defendant J. Ogden Armour voted for neither dividend, and plaintiffs do not claim he personally made any misrepresentations. It is claimed he is nevertheless responsible for the alleged misrepresentations made by the other individual defendants. This cannot be. A director not voting for a dividend or knowing of a false representation made by others is not liable. (*Garrett Co.* v. *Appleton*, 101 App. Div. 507; *Morgan* v. *Skiddy*, 62 N. Y. 319.) Furthermore, one director is not the agent of another. Considering the evidence in this case, Van Pelt, as a director, could not in legal effect be termed Armour's agent so that Armour could be held liable for Van Pelt's acts. Furthermore, I am satisfied that Farquhar in his various activities as narrated at the trial was not in legal effect the agent of his fellow-directors. I am aware of no theory upon which this action can be successfully maintained against Armour. Defendant George J. Baldwin had no part in the declaration of the first dividend, and neither made nor authorized anybody to make any representation, and there is no evidence that he knew or ratified any misrepresentation, and furthermore, the second dividend for which he voted was after plaintiffs had made the contract and exercised the option. In view of the evidence in the case he has not been proven liable.

As to the liability of the directors generally, where, as in this case, they were not the other party to the contract and did not receive the money paid, I am of the opinion that such liability can be based only on proof of fraud and deceit. Even if it be assumed that in this present action plaintiffs had the right to join the individual defendants, who, it is claimed, made the representations, with the defendant corporation, I would still hold that the individuals could be held liable only upon proof of fraud. Counsel for plaintiffs claims otherwise, and contends that in such an action as this an equitable action to rescind, the individual directors are

liable upon proof of material misrepresentations which were an inducing cause, and reference is made to the decision in the case of *Mack* v. *Latta* (178 N. Y. 525). It is true that case did decide that the individuals perpetrating the fraud could be joined with a defendant corporation in an action to rescind, but nowhere did it decide that the liability of the individual defendants was to be determined other than upon the basis of fraud. Furthermore, the complaint in that action did allege fraud against the individual defendants named. The case arose upon demurrers, and practically the only point presented is that suggested as follows (p. 527): " The question presented is whether an action can be maintained in equity against the individual defendants who made the misrepresentations, as well as the corporation receiving the money."

Chief Judge PARKER, who wrote the opinion, stated that there seemed to be no decision upon the question one way or the other (p. 528), but answered the question by permitting the action. The case, however, apparently never actually went to trial.

Counsel for plaintiffs seems to make a distinction between the liability of a director and the liability of another for the purchase of stock through his false and fraudulent representations. In my opinion the liability is exactly the same. (*Arkwright* v. *Newbold*, L. R. 17 Ch. Div. 301, 320; *Laska* v. *Harris*, 215 N. Y. 554; *Churchill* v. *St. George Development Co.*, 174 App. Div. 1.)

Even in the broader equity jurisdiction by which the English Court of Chancery may take cognizance of action involving fraud, where it is sought to hold an individual for fraud and deceit, his liability is the same, whether he be sued at law or in equity, as is shown by the following: " An action of deceit is a common-law action, and must be decided on the same principles whether it be brought in the Chancery Division or any of the common-law divisions; there being, in my opinion, no such thing as an equitable action for deceit." (*Arkwright* v. *Newbold, supra.*)

The only liability, therefore, of directors to third parties claiming to have been induced to purchase capital stock by the declaration of a dividend which they assumed was declared out of earnings, but which in fact constituted an impairment of the capital, is for actual fraud in voting for the dividend, knowing that it had not been earned, and for the purpose of inducing the purchase of the stock. (See dissenting opinion of MILLER, J., in *Ottinger* v. *Bennett, supra; Reno* v. *Bull*, 226 N. Y. 536.)

Moreover, an action for fraud and deceit can only be sustained by clear proof of actual fraud involving a corrupt motive and purpose not consistent with innocence. (*Crook* v. *Rindskop*, 105 N. Y. 476; *Morris* v. *Talcott*, 96 id. 100; *Roberts & Co. .v. Buckley*,

145 id. 215; *Constant* v. *University of Rochester*, 133 id. 640; *Adams* v. *Gillig*, 199 id. 314.)

Furthermore, we are not in any way to consider the statutory liability of directors as defined in section 58 of the Stock Corporation Law of 1923, who cause dividends to be paid out of the capital of a corporation. We are concerned merely with the particular liability predicated upon a fraudulent intent. I am led to believe from a review of all the testimony in this case that the individual defendants who voted for the dividends did so without any fraudulent intent. We are to bear in mind in considering this case that the plaintiffs are not of the ordinary class customarily plaintiffs in stock sale cases where fraud is claimed. Plaintiffs were experienced investment brokers, and they even had a department for investigations, which was in charge of Holder, a witness in this case. The defendants are men of affairs, who all invested large sums in the defendant corporation, and there is no evidence that at any time during the period under consideration they unloaded any of their holdings. In fact, during the period under consideration practically all of them increased their holdings in the corporation. The stock of the corporation sold to plaintiffs was the corporation stock and not stock owned by the individual defendants, and none of the individual defendants, of course, received any of the purchase price paid by the plaintiffs. Moreover, it appears that long prior to October 2, 1919, the common and preferred stock of the defendant corporation had been extensively traded in on the Boston Stock Exchange, and the plaintiffs had been actively engaged in buying and selling the stock, at least for customers, some time even before August 19, 1919. In voting for the dividends defendants apparently consulted counsel in an honest endeavor to ascertain if the declaration of the August dividend would be proper and legal. Furthermore, the August dividend was declared only after negotiations with the Boston Stock Exchange as to the best way to straighten out the market for the sale of the preferred stock, on which dividends had accumulated for approximately two years. I feel satisfied from the actual evidence that the August dividend was not declared for the sole purpose as claimed by plaintiffs of inducing plaintiffs' purchase. The question of paying the dividend had arisen some time before the important conference between Gurnett and Farquhar on August 23 or 25, 1919. Olney, secretary of defendant, had appeared before the listing committee of the Boston Stock Exchange on August fourth, and as early as that date the question of a dividend had been discussed. On August twelfth it appears that a notice was sent to all stockholders, asking them if a dividend were declared up to July 1, 1919, they would be

satisfied to receive the same in common stock at fifty dollars per share. It further appears that on July 25, 1919, Farquhar for the company had negotiated a sale of 6,000 shares of preferred stock to Hartshorne, Fales & Co. This sale was conditioned upon the company listing the preferred stock covered by the contract on the Boston Stock Exchange, and between July 25 and August 14, 1919, there seem to have been no negotiations for the sale of stock, but preliminary steps had been taken as above noted to clear up the situation with regard to dividends by declaring a dividend payable almost wholly in common stock. As to the December dividend, the evidence shows that the plaintiffs were most anxious that it should be paid, and even urged its payment. Holder himself admitted that they threatened that no more stock would be taken up under the contract unless the December dividend was paid: " Q. Oh, that is it — you threatened then that Richardson, Hill & Co. would not take up any more of the stock? A. Yes, sir. Q. Did you tell him that several times when you came over here? A. No, I think I told him it in a certain way that he understood."

When the August dividend was declared the directors had before them a cabled audit from Price, Waterhouse & Co. of December 28, 1918, and an estimate of the earnings for the first six months of 1919 made by Mr. Kyle, the accountant for the company in New York. If such audit were true and correct, the same showed abundant funds for the declaration of the dividend, even had it been made in cash. The directors testified that among other things they believed and relied upon such statements in declaring the dividend, and that they had no intent to deceive. I have held that later reports from Price, Waterhouse & Co. satisfy me that the financial position of the company did not warrant the declaration of the dividend, but the entire evidence in the case compels me to conclude that although the directors may have been negligent in not waiting for final certified reports, they still did not act with fraudulent intent for the purpose of inducing plaintiffs to buy. Such negligence, however, would not be sufficient to warrant a finding of fraud.

" There must have been a false representation, known to be such, made by the defendant, calculated and intended to influence the plaintiff, and which came to his knowledge, and in reliance upon which he, in good faith, parted with property or incurred the obligation which occasioned the injury of which he complains. All of these circumstances must be found to exist, and the absence of any of them is fatal to a recovery." (*Kuelling* v. *Lean Mfg. Co.*, 183 N. Y. 78.)

" His liability to respond to the plaintiff's claim depended upon

an intention to deceive and damages resulting in consequence. If he made his statements and representations in an honest belief of their truth, he would not be liable in such an action. If it was a case of bad judgment, or of carelessness in statement, merely, there would be no element of fraud." (*Townsend* v. *Felthousen*, 156 N. Y. 618, 623.)

The elements of an action for fraud and deceit are " representation, falsity, *scienter*, deception and injury." (*Reno* v. *Bull*, 226 N. Y. 546; *Ochs* v. *Woods*, 221 id. 335.)

It is, therefore, not enough that these defendants may have been negligent or used bad judgment.

" The man who intentionally deceives another to his injury should be legally responsible for the consequences. But if through inattention, want of judgment, reliance upon information which a wiser man might not credit, misconception of the facts or of his moral obligation to inquire, he makes a representation designed to influence the conduct of another, and upon which the other acts to his prejudice, yet, if the misrepresentation was honestly made, believing it to be true, whatever other liability he may incur he cannot be made liable in an action for deceit." (*Kountze* v. *Kennedy*, 147 N. Y. 124, 129.)

I am, therefore, satisfied from all the evidence of the case that the declaration of dividends by defendant corporation did not involve fraudulent representations of material fact made by the individual defendants for which they can be held liable in an action for fraud and deceit. The evidence to my mind fails to prove scienter on the part of these individual defendants.

Furthermore, the counsel for the individual defendants raised the point that the individual defendants have been improperly joined as defendants in this case and as authority for such contention refer to the case of *Ritzwoller* v. *Lurie* (225 N. Y. 464) as overruling, at least by implication, *Mack* v. *Latta* (178 id. 525). I have pointed out that in the latter case it was held that in an equitable action for a rescission it was proper to join individual defendants who made the representations with a defendant corporation. In *Ritzwoller* v. *Lurie* the action seems to have been similar. It was an action against a corporation for the rescission of a subscription contract for the purchase of stock which it was alleged was induced by false and fraudulent representations made by defendant Lurie as a promoter of a corporation and as a director upon its organization. Judgment was demanded against Lurie and the corporation for the amount of money the plaintiff had paid to the corporation on account of the subscription for the stock. The Court of Appeals held that the false representation

alleged to have been made by the defendant Lurie sufficiently stated a cause of action for the rescission against the corporation, and reversed the decision of the Appellate Division sustaining the demurrer interposed by the corporation, but affirmed the decision of the Appellate Division sustaining the demurrer interposed by Lurie and dismissed the complaint as to him. The Court of Appeals said, relative to the demurrer of defendant Lurie (p. 469): " The demurrer of the individual defendant is well made. In this action for rescission no cause of action is alleged against him. In making the alleged false representations he acted on behalf of the corporation and the money paid by plaintiff to him was so paid for the purpose of being turned over to the corporation for stock and was in fact so turned over. It is not necessary to consider what his liability would have been in some other form of action; he certainly is not a necessary or proper party to this action and no ground for relief is stated as against him."

Plaintiffs seek to distinguish *Ritzwoller* v. *Lurie* from *Mack* v. *Latta* by pointing out that in the latter case it was a case of an agent and director of the corporation, whereas such relationship was not shown to exist in *Ritzwoller* v. *Lurie*. I fail, however, to see how the cases can be distinguished. Notwithstanding the modern liberality in pleading, it does seem to me that there is much merit in the point raised by the individual defendants. In the first place, in an equity action for a rescission of a contract in which all parties are joined, including the corporation, the corporation is liable for any false material representation inducing the contract. The individuals making the representations are liable only upon the basis of fraud and deceit, including scienter. If the individual defendants can be joined they are deprived of their right to have the fraud issue passed upon by a jury. Moreover, the measure of liability is different. In a suit for rescission the recovery is of the consideration parted with on a contract implied by law against the other party to the contract who received the consideration as for money had and received, and not for damages. (*Yeomans* v. *Bell*, 151 N. Y. 230; *Lambert* v. *Elmendorf*, 124 App. Div. 758, 761; *National Trust Co.* v. *Gleason*, 77 N. Y. 400; *Bosley* v. *Nat. Machine Co.*, 123 id. 550, 555.)

As to individual defendants who did not receive the money, rescission cannot be had as to them, because they are not a party to the contract. They can be held liable only for damages, and the correct rule of damages is that stated in *Reno* v. *Bull* (*supra*) as follows (p. 553): " Plaintiff paid $5,000 for the stock purchased by him. If he were entitled to recover at all, it was the difference between that amount and the value of the stock which he received

with interest from that time. He was not entitled to anything else. This is the rule not only in this State, but in the Federal courts."

It is true that *Mack* v. *Latta* has been cited and often followed in the reported opinions of the appellate courts in this State, and as recently as May, 1922 (*Ressler* v. *Samphimor Holding Corp.*, 201 App. Div. 344). If, however, for the purposes of this case it were necessary to pass upon the alleged point of misjoinder of parties I would feel constrained to follow the principle enunciated in *Ritzwoller* v. *Lurie*. For the purpose of this trial, however, I shall assume that the individual defendants were properly joined and dispose of the entire issue as to the individual defendants upon the merits of the case.

I have pointed out that the declaration of the dividend on August 19, 1919, involved a material misrepresentation of such a character as would justify rescission of the contract of October 2, 1919, unless plaintiffs by laches or otherwise have deprived themselves of the right to demand rescission at the time this action was brought.

The defendant corporation claims, however, that even assuming that the corporation defendant was originally liable for misrepresentations made by it in the declaration of the dividend, the plaintiffs have lost their right to recover by reason of being guilty of laches. This claim of the defendant corporation is set forth in the special defenses contained in the answer to which reference has heretofore been made and is argued at length in defendants' brief. It is to be noted that plaintiffs were permitted to amend their complaint by adding a paragraph, No. 107-a, to the effect that it was not until November 28, 1920, that the real facts came to plaintiffs' notice, and then by way of the Levy report, and further that, on learning the facts, plaintiffs acted promptly. This action was instituted on February 21, 1921. The so-called Levy report is a report dated February 28, 1920, made by E. D. Levy to M. C. Brush, vice-president of the American International Corporation, on the condition, financial and otherwise, of the International Products Company. This report apparently is a more or less true picture of all the conditions in the company, as observed by an expert who was hired to make such a report. At the trial it seems to have been conceded, assuming false representations had been made, that the Levy report was of such a character that, once having become familiar with the facts therein contained, it was the duty of the plaintiffs to act with reasonable promptness. There was a great dispute, however, between the plaintiffs and

defendants as to just exactly when this report was available to the plaintiffs and when the plaintiffs had the opportunity for the first time to become familiar with the facts contained in the Levy report, and when plaintiffs became familiar with its contents.

Defendants claim that in addition to other knowledge of actual conditions possessed by plaintiffs long prior to February, 1921, the fact that Levy had made a report was made known to the plaintiffs by April, 1920, and that it was examined by plaintiffs' representatives not later than early August, 1920. In other words, defendants claim that plaintiffs knew of many of the facts early in 1920, or a long time before the action was brought, which the plaintiffs claim they did not ascertain until they became familiar with the Levy report some time in November, 1920. The defendants base their claim not only on the oral testimony of the witnesses, but on correspondence between the parties and the balance sheets and financial statements coming into the plaintiffs' hands at different periods early in 1920. In considering whether or not plaintiffs are now estopped from claiming rescission it is to be pointed out that plaintiffs were not the ordinary unsophisticated public, but experienced investment brokers, members of stock exchanges, with a department of investigation to get information in connection with new investments. It furthermore appears that plaintiffs had been more or less familiar with the stock of the defendant corporation, because the evidence shows that there had been trading in such stock on the Boston Stock Exchange prior to August 15, 1919. The defendants, in support of their claim of laches and estoppel, point to the fact that at the time of the stock purchase by plaintiffs, Gurnett knew that neither the company nor Farquhar had any certified auditor's account with respect to the earnings for 1919, and that Gurnett further admitted at the trial that in February, 1920, they were " still without figures." Farquhar states he told Gurnett that the canned meat market had " blown up " March 13, 1920, and I believe that to be a fact. Gurnett admits that on March 13, 1920, he came to the conclusion that the company was in bad shape. Gurnett testified as follows: " Q. Did you ever come to the conclusion that it was not an investment stock? A. Yes. Q. When? A. I came to that conclusion probably in the middle of 1920. Q. What do you mean by the middle of 1920? A. When it didn't pay dividends and when I began to learn that the company was in bad shape. Q. You mean when it failed to pay the July 1 dividend? A. Not necessarily then, but the accumulation of information given to us led us to believe that the condition of the company did not warrant calling it an investment stock. Q. Then I suppose the

accumulation of information given to you beginning March 13, 1920, and down to the middle of June, 1920, led you to believe that it was not an investment stock; is that right? A. Yes."

On April 16, 1920, it appears that Farquhar, Levy, Gurnett and McKean had a conference in New York. Gurnett admitted he knew when the different operations started — the cattle the middle of 1917, the quebracho extract December, 1918, canning and packing January, 1919. He admitted that at the conference above referred to held in New York on April 16, 1920, there might have been discussed a proposed $5,000,000 note issue to take care of the finances of the company. Farquhar testified he informed Gurnett, Putnam and Holder on March 13, 1920, that Levy had made a report for Mr. Brush of the American International Company, and he claims that again at the conference on April 16, 1920, he referred to the Levy report. Farquhar testified that he stated as follows: " I said Mr. Levy had made an investigation for the American International of the affairs of the International Products Company. * * * I said Mr. Levy is thoroughly familiar with the affairs of the company and he can give you his impressions and you can ask him what you wish to."

Gurnett admits that in June, 1920, he knew defendant corporation could not or would not pay the regular periodical dividend on all the outstanding preferred stock. He knew by April 20, 1920, according to his own testimony, that the difficulties in starting operations had not yet been overcome. He admits he knew in June, 1920, that the management was inefficient and that he knew in March, 1920, and April, 1920, that the earnings had been affected, but he claims he did not know why. Exhibit Z, it appears, came into the possession of the plaintiffs by April 20, 1920. Gurnett admits that at that time he knew that the losses and expenses had been charged to the capital account for the year 1919. Exhibit Z, above referred to, is a notice dated April 28, 1920, addressed to the stockholders of the International Products Company. On the back of the last sheet there is contained a consolidated balance sheet, approximate, December 27, 1919. One of the items therein contained is: " Special charges to cost of properties during organization period, $1,200,503.29."

Putnam admits he knew that the consolidated balance sheet just referred to showed a net loss for 1919. Gurnett admits he knew there was a discussion of a note issue in May, 1920, probably of from $4,000,000 to $5,000,000 with various people, including the National City Bank. In June, 1920, Putnam admits he was called into the discussion with regard to further financing. George Baldwin states that on June 9, 1920, he had an interview with

Putnam and showed him a copy of the Levy report and explained that Levy had reported upon the condition of the company. On June 9, 1920, Putnam was present with the directors of the company and others when the finances of the company were discussed as well as the necessity of raising additional capital. It appears that Farquhar had sent for Gurnett, but Gurnett being West at the time Putnam states that he came to the conference in Gurnett's place. I am satisfied that at this meeting it was pointed out in view of the Levy report and other reports at hand that the company was in a more or less precarious financial condition and that money was necessary to save it. I am further satisfied that by May, 1920, the plaintiffs knew that the company was in bad financial condition and that a change in management was necessary. Putnam admitted that in June, 1920, he realized that the company in 1919 was on an experimental basis. On July 11, 1920, Putnam, as a result of negotiation, was made a director of defendant corporation and continued as such down to January 21, 1921. He was also made a voting trustee of the stock of the company and held that position until 1921. If Mr. Putnam by the end of the summer of 1920 had not become familiar with all the company's affairs and finances, in my opinion he had himself to blame if there was still information that the plaintiffs needed to warrant disavowal of their contract with defendants within a reasonable time. McIlvaney, a vice-president of the defendant corporation since June, 1920, testified that in August, 1920, he showed to Dr. Ellis a copy of the Levy report and he stated that Ellis examined the same. Dr. Ellis was a newspaperman, who was employed by plaintiffs in writing advertisements and preparing " blue books " for the use of salesmen. McIlvaney states that Ellis took a copy of the Levy report to his hotel to look at it. Ellis, on the other hand, claims he did not take a copy of the report until November 16, 1920, when he first learned of the existence of such a report. George Baldwin stated that when he showed a copy of the Levy report to Putnam on June 9, 1920, Putnam did not even bother to ask for a loan of a copy of it. George Baldwin testified that in December, 1920, Gurnett came to see him for the purpose of effecting a loan upon the stock owned by the plaintiffs in defendant company. Gurnett at the trial testified that such a meeting actually took place, but that it took place in September or October, 1920, although apparently on his examination before trial he testified that the conversation took place on or about December 1, 1920. That in the early part of December plaintiffs knew that a question at least had arisen as to the payment of a dividend at the end of 1919 is shown from the following letter from Holder

to Olney on December 6, 1919: " We feel, therefore, that the only thing we can do is to send you a cablegram to transmit to Mr. Farquhar, and upon his reply your directors will undoubtedly come to a clear definition of policy. We suggest, therefore, that you transmit in code and forward to Mr. Farquhar the following telegram, advising us as soon as reply may be received: ' Surprised to find policy of paying preferred dividends if earned is open to discussion in minds of some of your directors. We feel strongly our engagement for stock made with policy previously definitely settled that if earned payment would be made January 1. We feel that every effort should be made to secure figures warranting such payment; otherwise we should not be expected to take up any more stock.' "

On December 10, 1919 (Exhibit M), Secretary Olney wrote to plaintiffs as follows: " Upon the question of your understanding of the conditions under which this company's first preferred dividend was paid, namely, up to July 1, 1919, I think your Mr. Hubbel or some other representative of your firm who was a member of the committee on the listing of stock upon the Boston Exchange will recall the meeting of that committee attended by him and myself also at which there was fully discussed the advisability urged on the part of the Boston Stock Exchange as well as firms of brokers in Boston and New York of our clearing up the dividend situation to July 1, 1919, primarily as a means of placing all the preferred stock upon the same basis, in order that there no longer be but the one class of preferred stock so far as the periods from which cumulative dividends were accruing was concerned. We had good reason to believe that it was well understood among those interested in an important way in our stocks that this first dividend was paid principally, if indeed not wholly, to meet the situation as above explained."

On April 11, 1920, Farquhar wrote Gurnett of the " blowing up " of the canned meat market, which he stated was not expected to come back for four or five years. On February 9, 1920, Holder writes that plaintiffs were without authority to quote figures for 1919. In his letter to defendant company of said date, February 9, 1920, Holder states: " This, of course, again brings up the question of information to us which we could use as to earnings for 1919, and we are still without authority from you to quote any figures. With the lack of figures and other information, our position in regard to the preferred stock of your company is not a pleasant one."

On June 11, 1920, Exhibit B-1 went out to all the stockholders, including plaintiffs. It said, among other things, on the 2d page:

"Several months ago it was arranged for Mr. Levy to make a study of the affairs of the company, which was done, and as a result he recommended certain refinancing, which, in his opinion, would be sufficient to carry through the new construction and place the company on an earning basis."

It appears that plaintiffs determined to bring suit against defendants about Christmas, 1920. On January 19, 1921, a circular letter (Exhibit W-3) and a formal proxy (Exhibit X-3) were sent out to all stockholders, including plaintiffs. These documents speak of the proposed creation of $5,000,000 eight per cent mortgage notes, to be authorized at a meeting to be held February 1, 1921. Before this call to stockholders plaintiffs had knowledge of the initiation and progress of this underwriting of new securities to obtain imperatively needed funds. Putnam, it is true, resigned as director on January 21, 1921, but up to this time apparently there was as yet no disavowal of plaintiffs' purchase. The stockholders' meeting referred to in Exhibits W-3 and X-3 was held February 1, 1921, and there were ratified all the actions of the directors in putting through and committing the company to the emergency underwriting mentioned in the notice to stockholders dated January 29, 1921 (Exhibit W-3). Up to this time there was no protest found or disavowal by plaintiffs. It further appears that McKean verified the complaint February 12, 1921, and the complaint was served February 21, 1921. It is also to be pointed out that in June, 1920, the directors again subscribed to stock, and at $65 a share for one common and one preferred, a total of $2,648,165, and $1,500,000 loan and credit were obtained from the National City Bank. Putnam approved the price of $65 fixed by the new stock issue. Gurnett testified he made no demand for the return of plaintiffs' money up to the beginning of the action.

It would seem to me, after a careful consideration of the foregoing testimony to which reference is made, and in view of considerable other testimony along the same line, that plaintiffs had early become aware or had ample opportunity to become aware of the exact condition of the company's finances and other details of the company, and the plaintiffs must early in 1920 have realized that the dividends declared were not justified by the actual financial condition of the company. Plaintiffs had apparently bought their stock at a price favorable to them compared with the current quotations for the preferred stock, and plaintiffs apparently were willing to go along without complaint so long as the market continued favorable. When the market conditions became adverse it appears that the plaintiffs were familiar with all the conditions bringing about such a market, but still, with knowledge of such

facts, instead of protesting or disavowing, they had substituted for 8,000 shares of preferred stock not yet taken up by them 22,800 shares of common stock at a price apparently favorable to them. And even after this, apparently, the plaintiffs were willing to go on month after month, although I am satisfied from the evidence that they knew or had an opportunity to know enough of the details of the company's exact condition on the dates the dividends complained of were declared. It seems to me that the plaintiffs were willing to gamble with the market, hopeful that the market for the stock might right itself. I am further satisfied from the evidence in the case that these plaintiffs knew of the existence of the Levy report as early as the summer of 1920, and that at that time the opportunity was presented to these plaintiffs to examine that report. When Putnam became a director and a manager of the voting trust, surely he was in a position to check up all the information that the plaintiffs had already ascertained as to the condition of the company. Putnam and the other plaintiffs knew of the new financing that was being indulged in, and of the new commitments that were being taken by the directors, but apparently the plaintiffs were willing to let all this take place, hopeful that their conditions might improve. It is true that Putnam resigned January 21, 1921, but even on that date there was no claim of fraud by the plaintiffs, although counsel had already been consulted and had already advised plaintiffs. Apparently there was no disavowal until the plaintiffs were fully satisfied that the condition of the company and the condition of the stock market indicated that the purchase was and must remain a big loss to the plaintiffs. For all of these reasons, which would seem to be amply proved by the testimony, I am of the opinion that any right that these plaintiffs had against the defendant corporation for rescission of the contract by reason of the false representations arising out of the declaration of the dividend of August, 1919, was lost by plaintiffs' failure to act within a reasonable time. It would seem that the situation disclosed in this case is somewhat analogous to that disclosed in the case of *Tapper* v. *Washington Refining Co.* (192 Iowa, 253, 265; 181 N. W. 664, 669): " He [the plaintiff] is apparently a man of large business experience, has long been president and manager of another corporation, doing an extensive business, and, if we may judge from the record before us, is accustomed to act with energy and efficiency; and we cannot believe that he was led blindfolded through this year and more of strained and vain effort to build up a self-supporting business, without acquiring a very complete knowledge of its true inwardness. It seems to us quite clear that, during all this time, he, with his

associates, was making a strenuous endeavor to tide the enterprise over the troubles which beset it, and that not until that endeavor appeared hopeless did he conclude that he had suffered a wrong which only the courts could remedy. A demand for rescission under such circumstances cannot be entertained."

So, too, in this case, I cannot believe that these plaintiffs were led blindfolded up to November, 1920, when they claim, owing to the Levy report, they first learned that they had been defrauded.

"The courts cannot be called into action in aid of a party whose cupidity has outrun his business judgment." (*Citizens' State Bank of Roundup* v. *Snelling*, 55 Mont. 476, 483; 178 Pac. 744, 745.)

Putnam cannot claim he was ignorant of actual conditions.

"In this case we have a director dealing with his own corporation. He is chargeable with such knowledge as to its affairs as he actually possessed, or which in the discharge of his duties he should have had. (*Ward* v. *City Trust Co.*, 192 N. Y. 61; *Syracuse Savings Bank* v. *Merrick*, 182 id. 387.)" (*Logan* v. *Fidelity-Phenix Fire Ins. Co.*, 161 App. Div. 404, 410; affd., 220 N. Y. 688.)

"I think the true rule is that, where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." (*Higgins* v. *Crouse*, 147 N. Y. 411.)

"If a party has sufficient information to put a prudent man upon inquiry, and he neglects to make inquiry, the inference of actual notice is necessary and absolute." (*Kilmer* v. *Hutton*, 131 App. Div. 625.)

"A party claiming to rescind a contract for fraud must act promptly on discovery of the fraud, and restore, or offer to restore, to the other party what he has received under it. He cannot thereafter deal with the other party on the footing of an existing contract, or with the property acquired under it as his own." (*Davis* v. *Levering*, 168 App. Div. 78, 80.)

Within the meaning of the cases to which I have referred, and of others, the citation of which does not appear to be necessary, considering the mass of testimony, which seems to establish to my mind plaintiffs' laches in their disavowal of the contract, it is my opinion, in view of the facts established by the evidence in this case, that on February 21, 1921, plaintiffs' own conduct up to that date and their apparent acquiescence had estopped them from disavowing the contract. Their attempted rescission was too late, and, along the lines which I have indicated, defendants are entitled to judgment, and I so find.